**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

--------------------------------------------------------------x

**UNITED STATES OF AMERICA** :

:

: **Docket No.:**

**- against -** : **03-CR-1009 (ARR)**

:

:

**JOSEPH BRAUDE,** :

**Defendant** :

--------------------------------------------------------------x

# SENTENCING MEMORANDUM
# PREPARED ON BEHALF OF JOSEPH BRAUDE

**Benjamin Brafman, Esq.**
**Brian E. Klein, Esq.**
**Lourdes Olvera, Legal Asst.**
Brafman & Ross, P.C.
767 Third Avenue, 26th Floor
New York, NY 10017
Tel: (212) 750-7800
Fax: (212) 750-3906
E-mail: brafross@aol.com

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ........................................................................... 3

BACKGROUND ........................................................................................... 4

SUGGESTED AND WARRANTED DOWNWARD ADJUSTMENTS TO THE SENTENCING GUIDELINES TOTAL OFFENSE LEVEL ............................................. 8

A. Joseph Braude has accepted full responsibility for his offense conduct and should receive a two-level downward adjustment in his total offense level under Section 3E1.1(a) of the Guidelines ............................................................. 9

B. A downward departure is warranted because Joseph Braude's offense conduct falls within the rubric of "aberrant behavior" pursuant to Section 5K2.20 of the Guidelines ........................................................................................ 13

JOSPEH BRAUDE'S PERSONAL HISTORY, HIS CHARACTER AND THE CIRCUMSTANCES SURROUNDING THE CHARGED OFFENSES SUGGEST A SENTENCE WITHOUT INCARCERATION IS WARRANTED ................................... 16

A. Brief Overview of Joseph Braude's Personal History ........................................ 17

B. Joseph Braude Has Helped Protect This Country from International Terrorist Organizations ................................................................................... 20

C. Joseph Braude is a Uniquely Loving Person .................................................. 25

D. Joseph Braude is a Devoted Middle East Scholar ............................................ 30

E. Joseph Braude Has Successfully Addressed Psychiatric Issues ....................... 35

F. Joseph Did Not Purchase the Three Cylinder Seals for Personal Gain ............. 36

G. The Three Cylinder Seals are of Minor Value .................................................. 38

H. Joseph Still Has Much He Can Contribute to Society ....................................... 39

I. Joseph Braude's Mother and Brother Plead for Leniency on his Behalf ............ 42

THE CONSTITUTIONALITY OF THE SENTENCING GUIDELINES .......................... 42

CONCLUSION ........................................................................................... 44

## PRELIMINARY STATEMENT

This memorandum is respectfully submitted on behalf of Joseph Braude to aid this Court in determining a fair and just sentence in his case.

Joseph stands before this Court having pled guilty to one count of importing merchandise contrary to law, in violation of 18 U.S.C. § 545, and two counts of making material false statements to government officials, in violation of 18 U.S.C. §1001. Sentencing is scheduled for November 22, 2004.

Counsel respectfully submits that Joseph is a man of fundamentally good nature; a man who is profoundly dedicated to his family and friends, is committed to a peaceful and prosperous Middle East, has selflessly applied his talents to extraordinary efforts to aid this nation's national security and was motivated in this case to safeguard the three cylinder seals at issue. When Joseph imported the seals (that others had looted from the Iraq Museum) and then misled U.S. Customs officials about his trip to Iraq and the value of the goods he had purchased abroad, he exercised bad judgment and knowingly violated the law. He did so, however, with the best of intentions. Joseph's criminal conduct that day represents a brief and isolated incident that does not accurately reflect the exemplary life he has always led.

Counsel asks this Court to fashion a sentence that achieves the goals of sentencing while permitting Joseph to continue his positive contributions to his family and friends, to the Middle East and to this nation's national security. Counsel believes that in Joseph's case a sentence of incarceration is not appropriate.

## BACKGROUND

On June 11, 2003, Joseph arrived at John F. Kennedy International Airport ("JFK") after an approximately 35-hour trip from Baghdad to Kuwait to London to New York City. Joseph was returning from a week long trip to Baghdad, during which time he explored his own Iraqi-Jewish heritage, gathered information for a new introduction to the paperback version of his recently published book, The New Iraq: Rebuilding the Country for Its People, the Middle East, and the World, and made contact with a government official and private businessmen, with the idea of returning to Iraq to work, in some capacity, on rebuilding the country.

Upon disembarking the plane, Joseph was carrying in his luggage three cylinder seals that he had purchased in Baghdad on the black market. Joseph did not purchase these seals for his own enrichment or as souvenirs. Rather, as a devoted Middle East scholar, he purchased them, believing them to have been looted from the Iraq Museum, to make sure they were not lost to history on the black market.

At that time, however misguided, Joseph believed that handing the seals over to someone in Baghdad would have been too dangerous, as the city was in chaos. At all times during his visit to Baghdad, Joseph traveled with the understanding that he was to avoid Americans and American occupied areas for the sake of his own safety. Although the war was officially over, the insurgent campaign had only just begun. Also, Joseph had only one government contact in Baghdad, Harold Rhode, who had departed from the city before Joseph purchased the seals. Finally, aware of the Iraq Museum's looting and the distrust this had fostered among the Iraqi population, Joseph

felt that the best chance to safeguard the seals was to return them to his Pentagon or university contacts in the United States.[1]

Joseph believed that his contacts in the United States would be able to determine the origin and genuineness of the seals. With that nebulous plan in mind, Joseph transported the seals back home.

Immediately upon disembarking from the plane, a U.S. Customs official (acting on information from the FBI that Joseph may have traveled to Iraq) intercepted him. Joseph was swiftly escorted to a search area, where U.S. Customs officials searched his bags and questioned him about his travel itinerary. In response to this initial round of questioning, Joseph falsely stated that he had not been to Iraq and on his U.S. Customs Declaration form Joseph did not list Iraq as one of the countries he had visited and also stated that he had purchased only fifty dollars worth of goods while abroad, without describing the goods.

Joseph's failure to accurately fill out his Customs Declaration form and to state truthfully at the outset that he had been to Iraq represents the criminal conduct on his part. Joseph naively believed that, because he had done so much valuable work for the government in the past and had important ongoing relationships with Pentagon/State Department officials involved in rebuilding Iraq, he could bypass U.S. Customs and thus tried to avoid their inquiry. It was a stupid idea, and Joseph's decision not to trust U.S. Customs officials was an error in judgment he will regret his entire life. He committed a crime and, however noble or misguided his efforts were, he

1 Joseph's past experience of providing law enforcement agencies with information regarding international terrorist organizations (discussed infra) led him to believe that the best way to safeguard the seals was to bring them back to the Pentagon or university officials he was acquainted with and could trust.

knowingly violated the law.

During the search of Joseph's bags, the seals were discovered inside his carry-on luggage in a small translucent plastic case, along with business cards. In addition, Iraqi business cards were found his carry-on bag.

When the business cards and seals were found, Joseph was led into a private search room where, realizing his stupidity, he immediately set out to rectify the situation. Accordingly, Joseph explained to Special Agent Bryant Wong of the Bureau of Immigration and Customs Enforcement that he had indeed been to Iraq and that the seals may have been looted from the Iraq Museum. Joseph also stated that he planned to turn the seals over to the proper authorities. After further questioning, Joseph was released.

A few days later, on June 17, 2003, Agent Wong contacted Joseph at his apartment in Cambridge, Massachusetts, regarding his trip to Iraq and the seals. Joseph agreed to meet with Agent Wong at his apartment the next day to discuss the matter further. Joseph actually looked forward to the meeting because he believed he could provide information to Agent Wong that would assist the government in closing down the black market trade in looted Iraqi artifacts and thus at least partially atone for the bad judgment he had initially exercised.

On June 18, 2003, Agent Wong interviewed Joseph at his apartment. Joseph chose not to have an attorney present because, at that time, he did not believe he was the target of a criminal investigation. During the interview, Joseph openly disclosed to Agent Wong exactly how he secured a Kuwaiti visa, the names of his host in Baghdad, his host's family, people he spoke with before his departure and people in London he

spoke to about his intended trip. Joseph also disclosed that although he had authored a book on Iraq, he had not been able to travel there until the fateful June 2003 trip. Joseph also went on to discuss his Baghdad host, Wahlid Taha, and disclosed Mr. Taha's contact information and other details about their conversations regarding the looting of the Iraq Museum. Joseph described in careful detail the transactions and conversations that resulted in his acquisition of the seals. Joseph spoke freely to Agent Wong because he honestly wanted to assist the government and make up for his earlier misdeeds.

Despite Joseph's willingness to continuing his discussions with the government, on August 8, 2003, without further discussion, Joseph was arrested at JFK upon his return from London on business. The following day Joseph was released on bond.

On September 5, 2003, a grand jury returned a two-count indictment, charging Joseph with illegal importation of the seals, in violation of 18 U.S.C. § 545, and making a false statement regarding whether he had traveled to Iraq, in violation of 18 U.S.C. § 1001.

In an attempt to negotiate a misdemeanor plea and a cooperation agreement, on January 7, 2004, Joseph met with the government to confidentially discuss how he could potentially cooperate with the government's ongoing efforts to recover looted artifacts. Soon after that meeting, however, Joseph revealed his attempt to cooperate to a close and dear friend whose name arose during the meeting as a possible subject, witness or target of that investigation. Upon learning of this, counsel immediately notified the government for fear that any effort to conceal that fact would only further compromise the government's inquiry.

Joseph's attempt to protect a loved one whom he believed was, at most, tangentially connected to criminal conduct, when viewed in light of the discussion of his devotion to his family and friends infra, will become more understandable. In retrospect, however, Joseph profoundly regrets his impulsive action since it compromised his ability to resolve this case.

On April 15, 2004, a three-count superseding indictment was returned, adding the charge of making a false statement regarding the value of the seals, in violation of 18 U.S.C. § 1001.

On August 2, 2004, Joseph's trial began and shortly thereafter, on August 3, 2004, Joseph pled guilty.

## SUGGESTED AND WARRANTED DOWNWARD ADJUSTMENTS TO THE SENTENCING GUIDELINES TOTAL OFFENSE LEVEL

The Probation Department's October 12, 2004 presentence report ("PSR") set Joseph's total offense level at 12 (10 to 16 months), based on its Sentencing Guidelines Manual ("Guidelines") calculations. PSR ¶ 31.

In response to the PSR, on October 26, 2004, we submitted a letter to the Probation Department requesting certain factual clarifications and objecting to the Guidelines calculations regarding the two-level upward adjustment for obstruction of justice and the two-level enhancement because the seals were deemed to be "designated ethnological materials." Ex. 1, Letter from Brafman & Ross to Probation Department of 10/26/04 ("PSR Letter").[2] The acceptance of these two

2 As Your Honor knows, the United States Attorney Office's ("USAO") also objected to the PSR. (Letter from USAO to Judge Allyne Ross of 10/26/04 ("USAO Letter").) The USAO objected to the PSR's two-level reduction for acceptance of responsibility and the seals being deemed "designated ethnological materials," arguing they should have been deemed "cultural property," (USAO Letter, at 4-7).

objections results in a total offense level of 8 (0 to 6 months).

On November 9, 2004, the Probation Department submitted its Addendum to the PSR ("Addendum"). In pertinent part, the Addendum overruled the USAO's objection to a two-level reduction for acceptance responsibility, reclassified the seals as "cultural property" (thus maintaining a two-level enhancement pursuant to Guideline 2B1.5(b)(3)) and denied counsel's objection to a two-level upward adjustment for obstruction of justice. Consequently, the Addendum maintains Joseph's total offense level at 12 (10 to 16 months).

Despite the Addendum, we incorporate all of our original objections outlined in our PSR Letter into this memorandum. In addition, we respectfully request this Court consider and incorporate the following downward adjustments into the sentence imposed, a two-level downward departure for acceptance of responsibility (as is maintained in the PSR and its Addendum) and a downward departure for "aberrant behavior." Both of which are discussed in detail below. Importantly, if this Court finds grounds for an "aberrant behavior" downward departure, this Court would only then probably need to make a relatively minor downward departure of two or four-levels to reach a sentencing range that permits a sentence without incarceration.

**A. Joseph Braude has accepted full responsibility for his offense conduct and should receive a two-level downward adjustment in his total offense level under Section 3E1.1(a) of the Guidelines**

As the PSR and its Addendum conclude, Joseph is entitled to the two-level downward adjustment in his offense level because he has accepted full responsibility for his offense conduct.

Section 3E1.1(a) of the Guidelines provides: "If the defendant clearly

demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." Further, pursuant to Application Note 5 of Section 3E1.1 of the Guidelines, whether a defendant has accepted responsibility for his offense conduct and is entitled to a reduction is a fact question for the district court. The record indicates that Joseph has, and continues to, demonstrate the high level of acceptance of responsibility necessary for the Court to make a two-level downward adjustment in his offense level.

On August 3, 2004, during the second day of his trial, Joseph pled guilty to all three counts of the superseding indictment. At that time, without a plea agreement, Joseph truthfully admitted his involvement in the charged crimes. Before Your Honor in open court and under oath, Joseph stated:

> "[O]n June 11th, 2003, I brought three cylinder seals which were the property of the Iraqi Museum into the Kennedy Airport in Queens, New York. I knew bringing these items into the U.S. was contrary to law. On the same day, I told Agent Wong of U.S. customs I had not visited Iraq when in fact I had. I knew it was illegal to make a false statement to a Customs officer. I also undervalued the three seals by stating on my Customs declaration form that they were valued at fifty dollars when I knew that they were worth in excess of two hundred dollars. I accept responsibility for my conduct and I deeply regret my actions.

See Transcript of Trial at 443. Joseph's entry of this guilty plea is significant evidence of his full acceptance of responsibility for his offense conduct.

Indeed, the Probation Department credits Joseph with acceptance of responsibility, citing Joseph's plea allocution as one of the factors. PSR ¶ 12; Addendum, at 1-2. The Probation Department also noted that since his guilty plea, Joseph appears to have continued to accept full responsibility. PSR ¶ 12.

Joseph's acceptance of responsibility is also evidenced by his genuine remorse for his unlawful behavior. See United States v. Ruggiero, 100 F.3d 284, 295 (2nd Cir. 1996) (noting a defendant's remorse is a factor in a court's finding of acceptance of

responsibility). Not only did Joseph express his regret to this Court during his plea allocution, but he continues to live with regret. Joseph's uncle, Benjamin Braude, explains:

> During this past year I have seen [Joseph] gradually come to grips with his criminality. Precisely because he is a good person and moral person, it has taken him a very long and painful time to realize that some might legitimately regard him otherwise and that his actions were not good and not moral. It has been a painful experience, but has learned an important lesson. He will never again commit such a crime.

Ex. 2.

Dean Starkman, a mentor during high school and friend of ten years, also notes Joseph's profound sense of regret:

> Joe is remorseful and knows he has done wrong. He understands not only that he broke the law, with all that that entails, but also that he acted in a way that was terribly self-destructive and contrary to his own values. What's more, I believe that this collision with the criminal justice system has affected him profoundly and has had results that, paradoxically enough, can be only seen as beneficial. I believe it has spurred him to being a process of introspection into what caused him to make these obviously disastrous choices.

Ex. 3.

The question of whether Joseph has earned a two-point reduction in his offense level pursuant to Section 3E1.1(a) of the Guidelines does <u>not</u> necessarily turn on the <u>timing</u> of his plea, but on whether he has, in fact, accepted responsibility for his conduct and expresses remorse. For example, in <u>United States v. Volpe</u>, the Second Circuit affirmed a district court's denial of credit for acceptance of responsibility based on the district court's finding that the defendant's "statements before and after his plea evinced a lack of remorse and a failure to acknowledge fully the wrongfulness of his conduct," <u>not</u> simply because he pled guilty after the commencement of trial. 224 F.3d 72, 76 (2nd Cir. 2000).

Counsel recognizes that the downward adjustment for acceptance of responsibility, except in "rare" cases, is not intended to apply to a defendant who persists in his plea of not guilty, proceeds to trial, is convicted and only then admits he is guilty. Application Note 2 of Guidelines Section 3E1.1; see, e.g., United States v. Castano, 999 F.2d 615, 617 (2nd Cir. 1993). But that Application Note does not apply to this case. Although Joseph initially exercised his Constitutional right to a trial, he changed course during the second day of trial and pled guilty, expressing genuine acceptance of responsibility for his conduct. Joseph accepted responsibility for the actions well before the end of trial, and even before the government rested its case, making that Application Note not applicable here.

The fact remains, and the Second Circuit has recognized, that a two-level reduction pursuant Section 3E1.1(a) of the Guidelines may well be appropriate where a defendant pleads guilty and accepts responsibility even after trial has commenced but before the case is submitted to the jury. In United States v. Ramirez, the Second Circuit affirmed the defendant's sentence, which included a two-level reduction for acceptance despite the fact that the defendant pleaded guilty after his trial had begun and the government had finishing questioning its first witness. 175 F.3d 1009 (2nd Cir. 1999). Likewise, in Nanfro v. United States, the district court applied the two-level reduction to the offense level of a defendant who pleaded guilty after the commencement of trial. 1997 WL 391265 (S.D.N.Y. 1997).

While the timing of Joseph's plea is an issue this Court may look to in determining whether Joseph has accepted responsibility pursuant to Section 3E1.1(a) of the Guidelines, it is not dispositive of the issue. We respectfully ask this Court to

accept the Probation Department's objective analysis of this issue, which concludes that Joseph has truly and sincerely accepted responsibility for his conduct and thus is entitled to a two-point reduction of his offense level.

### B. A downward departure is warranted because Joseph Braude's offense conduct falls within the rubric of "aberrant behavior" pursuant to Section 5K2.20 of the Guidelines

Joseph's offense conduct represents aberrant behavior within the meaning of Section 5K2.20 of the Guidelines and as such warrants a significant downward departure.

Pursuant to Section 5K2.20 of the Guidelines, this Court has the discretion to downwardly depart if a defendant "committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life."

We now turn to the application of these standards. First, Joseph's offense was the result of, at best, minimal planning. In United States v. Khan, the Second Circuit in upholding a downward departure for aberrant behavior noted that "the planning consisted of little more than wrapping the cash in sealed parcels and putting them in [the defendant's] luggage." 2004 WL 819097, *37 (2nd Cir. April 16, 2004).[3] For all intents and purposes, that is what happened in this case. The seals, easily located in Joseph's carry-on bag, were wrapped in tissue and neatly packed in a small translucent plastic container. The record supports the notion that Joseph put little, if any, thought

---

3 Although this case is a summary order and its citation is discouraged pursuant to Second Circuit Rules § 0.23, counsel is compelled to include it for informational purposes due to its relevance. In support of this position, counsel relies on of Shady Records v. Source Enterprise, *2 n.4 (S.D.N.Y. June 8, 2004).

into planning.

Second, Joseph's charged offenses were of limited duration. In the Second Circuit, offense conduct taking place over three weeks, or even longer, has been found to be of a limited duration. United States v. Hued, 2004 WL 2072491, *5 (2nd Cir. Sept. 10, 2004); United States v. Gonzalez, 281 F.3d 38, 47-48 (2nd Cir. 2004); see also United States v. Langille, 324 F.Supp.2d 38, 42 (D. Maine 2004) (finding that a bungled bank robbery was an occurrence of limited duration (and minimal planning)). Joseph's offense conduct revolves around his having inaccurately completed his U.S. Customs Declaration form and initially making two false statements to U.S. Customs officials. All of this took place over a matter of, at most, an hour (from the time he was handed a U.S. Customs Declaration form on the plane as it approached JFK to when he was first questioned about where he had been and what he had upon disembarking at the airport). Further, Joseph tried to rectify the situation within minutes of his initial lies, and continued to demonstrate a willingness to do so thereafter, effectively putting an end to his crime before any damage was done. In short, Joseph's offense conduct was of a very limited duration.

Third, the admitted crimes undoubtedly represent a "marked deviation" from Joseph's otherwise law-abiding life. Joseph has had no encounters with the criminal justice system either as an adult or juvenile. In addition, Joseph has been more than just law-abiding. As will be discussed later in this memorandum, Joseph has made major and outstanding contributions not only to his local community but to this nation's national security. The attached letters from family, friends, business colleagues, community members and prominent figures confirm these facts as well as the aberrant

nature of Joseph's misconduct. Considering all of the facts of this unusual case, it is indisputable that the offense conduct is a "marked deviation" from what has been an exemplary life.

In deciding whether to depart for aberrant behavior, this Court "may consider the defendant's (A) mental and emotional conditions; (B) employment record; (C) record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense." Application Note 3 of Guidelines Section 5K2.20. An examination of these considerations makes it abundantly evident that Joseph deserves a downward departure for aberrant behavior. All five factors are relevant to this case and deserve this Court's attention, especially Joseph's record of prior good works, his motivation for committing the offense and his efforts to mitigate the effects of the offense.

The extent of Joseph's prior record of good works is unquestioned. As will be discussed in detail infra, Joseph was at the vanguard of the fight against international terrorism for many years. To that end, he provided far-reaching and courageous assistance to law enforcement. Joseph did so willingly, inspired by his patriotism, and asking for essentially nothing in return. We respectfully submit this factor should weigh heavily in favor of granting Joseph a downward departure based on aberrant behavior.

Joseph's motivation for bringing the seals back to the United States also merits this Court's favorable consideration. As was also discussed earlier, Joseph brought the seals back, not for personal profit, but to ensure they were safeguarded. All of the evidence points to this fact.

Finally, we note that within literally minutes of being questioned by U.S. Customs officials at JFK, Joseph admitted his crime and told the truth.

Simply put, Joseph's offense conduct was "aberrant" in the truest sense of the word and our request for a downward departure based on this ground has tremendous merit.

**JOSPEH BRAUDE'S PERSONAL HISTORY, HIS CHARACTER AND THE CIRCUMSTANCES SURROUNDING THE CHARGED OFFENSES SUGGEST A SENTENCE WITHOUT INCARCERATION IS WARRANTED**

Congress has mandated that a sentencing court "shall impose a sentence sufficient, but not greater than necessary," to comply with the sentencing purposes of punishment, deterrence, protecting the public from further crimes of the defendant, and providing the defendant with needed educational, medical, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a). In making this determination, the court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant," the need for the sentence imposed to achieve each of the enumerated purposes of sentencing, the kinds of sentences available, the applicable guideline range, and the need to avoid unwarranted sentence disparities among similarly situated defendants. Id. This Court is not limited with respect to the information concerning a defendant's background, character and conduct that it may consider for the purpose of imposing an appropriate sentence. 18 U.S.C. § 3661; Guidelines Section 1B1.4.

Weighing the circumstances surrounding Joseph's offense against: 1.) his record of invaluable cooperation with law enforcement agencies in terrorist investigations; 2.) his exemplary behavior as a loving family member and friend; 3.) his devotion to Middle

East scholarship; 4.) his ability to continue to successfully address psychiatric issues; 5) the fact that he did not purchase the seals for personal gain; 6.) the limited value of the seals and 7.) the fact that he still has much he can contribute to society, we respectfully submit that a sentence without incarceration is warranted.

**A. Brief Overview of Joseph Braude's Personal History**

At the outset, we offer this brief overview of Joseph's personal history to provide this Court with a broader understanding of why Joseph is truly a remarkable person deserving of leniency.

Joseph, age thirty, was born in Boston, Massachusetts, to Joel and Rita Braude. He has one sibling, Yonatan ("Yoni"), a younger bother, who is twenty-seven and now attends the University of California at Berkeley's law school. A year after Joseph was born, his family moved to Providence, Rhode Island, where he would live until he left for college.

From an early age, Joseph showed extraordinary promise. He excelled at school, music and other creative endeavors. He also developed a keen interest in the Middle East, particularly his own Iraqi-Jewish heritage. (His mother was born in Iraq and his great-great grandfather on his mother's side was the Chief Rabbi of Baghdad.)

Joseph did not have an easy childhood because his parents went through a bitter divorce when he was twelve. The divorce was due in large part to his father's mental illness. Joseph's father suffers from Manic-Depressive Illness/Bipolar Disorder and was under sporadic treatment and had been hospitalized several times <u>before</u> Joseph was born. Because of his condition, Joseph's father did not hold regular employment so Joseph's mother, Rita, was essentially the sole breadwinner, putting a

severe strain on the family. During the divorce, Joseph's father was also mentally and on occasion physically abusive to Rita and Joseph.

After the divorce, Joseph and his father's relationship became severely strained. Since that time, Joseph has had mostly infrequent, minimal contact with his father. To this day, their relationship remains a difficult and complicated one that weighs heavily on Joseph.

Around the time of his parent's divorce, Joseph's mother lost her well paying job at the University of Rhode Island and the family struggled to make ends meet. When the divorce was finalized, the family's financial situation deteriorated even more. As a result, to earn his own keep, Joseph played music at Bar Mitzvahs (as by then he had mastered the piano) and started a well-received and financially successful community newspaper, with himself serving as the publisher, editor and its chief reporter.

Despite the tough times and his additional responsibilities, Joseph continued to excel at school and at extracurricular activities. After graduating from high school in 1992, he was admitted to Yale, where Joseph financed his undergraduate education largely with money earned from his community newspaper. At Yale, Joseph pursued his burgeoning passion for the Middle East, majoring in Near Eastern Languages and Civilizations. Joseph mastered Hebrew, Arabic and Persian and learned to play the Oud, a Middle Eastern stringed instrument. He also spent significant time traveling and studying throughout the Middle East.

Due to Joseph's strong language skills, his vast knowledge of the Middle East and his sense of patriotic duty, Joseph also spent significant time in college investigating international terrorist organizations that were then trying to plant roots in

the United States. Joseph worked closely with the FBI, the CIA, the Manhattan District Attorney's Office and other law enforcement agencies as well as a non-governmental organization, The Investigative Project.

During these hectic college years, Joseph's mother, who had by then remarried, unfortunately went through a second difficult divorce. Her second husband, after an affair, abandoned the marriage, once again putting tremendous emotional and financial strain on his mother as well as him and his younger brother. Joseph again helped his family successfully navigate this crisis while still maintaining excellent academic standing at Yale.

Graduating from Yale *magna cum laude* and with honors in his major, Joseph went on to pursue a Ph.D. in Near Eastern Studies at Princeton. His passion for the Middle East was developing into a profession, as Joseph was becoming a respected scholar. Joseph also continued his assistance to law enforcement agencies (and The Investigative Project), investigating international terrorist organizations in the United States. In 1998, he received a Masters Degree from Princeton in Near Eastern Studies. Due to his own bout of mental illness, Joseph, however, left the Ph.D. program in 2000 before receiving his doctorate.

After successfully dealing with his psychiatric issues that same year at home in Providence, Rhode Island, Joseph moved to Cambridge, Massachusetts and went to work for a telecommunications consulting company, Pyramid Research, where he was the senior Middle East analyst. At his new job, Joseph traveled throughout the Middle East advising telecommunications companies and governments on regulatory issues and business transactions. In addition, he assisted a division of the State Department

in the preparation of an extensive analytical report on public diplomacy initiatives in the Arab world after 9/11.

In 2002, believing that the United States was on the path to war with Iraq, and while still working full-time at Pyramid Research, Joseph wrote his first book, The New Iraq, a well-received hardcover book on the prospects for rebuilding Iraq after the fall of Saddam Hussein. After the war with Iraq was believed to be over in May 2003, Joseph undertook his fateful trip to Iraq, a country he had not been able to visit while Saddam Hussein was in power.

**B. Joseph Braude Has Helped Protect This Country from International Terrorist Organizations**

Joseph's deep understanding of the Middle East, its culture, history and languages and his patriotic feelings for this country caused him for many years to work in dangerous undercover roles providing crucial assistance to law enforcement investigations of international terrorism.

This remarkable sense of civic duty began at an early age and grew over time. For example, when Joseph was just twelve years old he starting writing and publishing a weekly community newspaper. The newspaper was designed to expose "concerns in the neighborhood and made its primary concern the improvement of that neighborhood, by acting as a forum for business initiatives and other ideas. " Ex. 4, Letter from Paul Hecht. Joseph also taped anti-drug radio plays for his middle school. See Ex. 5, Letter from Eitan Sabo. In addition, while Joseph was still in high school, he brought together the five Providence mayoral candidates to play an urban planning game called SimCity and wrote a front page article in the Lifebeat section of the Providence Journal on the experience. Id. Considering his very early involvement in civic life, it is not surprising

that as Joseph got older, he would eventually apply his considerable talents and skills to help safeguard this country.

Joseph's involvement with investigating international terrorist organizations operating in the United States began in college when he went to work for Steven Emerson, the founder of The Investigative Project, a well regarded public policy counterterrorism institute created in the aftermath of the first World Trade Center bombing in 1993. Mr. Emerson, one of the world's leading experts on terrorist organizations, explains Joseph's involvement with him and his institute:

> Joseph served as my research assistant and was seminal in the creation of my organization. He worked for me day in and day out, preparing some of the most brilliant analytical briefing papers that I have ever seen. During his college years, he continued to work for me, shuttling between New Haven and Washington DC, in helping to investigate militant Islamic terrorist groups in the United States. <u>I can tell you that without Joseph's input and work, I could never have created my institute. I can also tell you that US government investigators and analysts were awed by the brilliance and perseverance demonstrated by Joseph</u>.

Ex. 6 (emphasis added).

Joseph associated with Mr. Emerson to help him produce the acclaimed documentary movie *Jihad in America*, a film which investigated radical Muslim groups in the United States and the potential threat that they posed. It was during that time that Joseph also began providing information and materials to the FBI. Former FBI Special Agent Thomas Walczykowski, assigned at the time to the FBI's Hamas Counterterrorism Unit in Washington D.C., writes about Joseph's heroic efforts on behalf of the United States:

> For almost a year prior to the broadcast, Mr. Braude, in an independent undercover capacity traveled across the country, visiting selected Mosques and conferences, meeting with radical Islamic groups and individuals bent on bringing terrorism to the United States. He posed as a potential jihadist and collected videos that these radical groups produced to support their fund raising

> and recruiting. . . . Mr. Braude also carried out non-official trash covers and other investigative techniques targeted against several of the radical Islamic front organizations in the Northern Virginia/Washington D.C. area. He and his small group of independent private terrorism investigators spent days pasting shredded documents back together. He was totally focused on a mission to educate the American public and the U.S. Government on the grave hazards that radical Islamic terrorists presented to the United States and carried out his work for little pay. He did his work without the backstopping and backup afforded FBI special agents working in an undercover capacity to ensure their safety. He also operated without the checks and balances or supervision to minimize any potential embarrassing or troubling situations resulting from his aggressive investigative activities.

Ex. 7 (emphasis added).

Special Agent Walczykowski maintained contact with Joseph after *Jihad in America* was aired and the FBI continued to use him as an intelligence resource on a variety of important investigations. For example, in 1994, Joseph provided the FBI with a detailed report on a variety of Islamic organizations that may have been covers for terrorists. Ex. 8. In addition, in 1995, Joseph provided the FBI with a detailed report on the Nationalist-Islamist Congress, a radical new organization that had emerged from Beirut. Ex. 9. Joseph was an extremely valuable asset because as a civilian, he did not have to operate under the restrictions the FBI imposed on itself before 9/11.

Special Agent Walczykowski explains:

> At that time, the FBI was operating under rules and regulations that inhibited our investigations of radical Islamic terrorism. For example, special agents as well as operational assets under official FBI directions were prohibited from entering a Mosque to listen to speeches advocating terrorism. Of course, few of us understood the language. Mr. Braude did understand the language and independently associated with these radical groups and individuals. Since he was officially operating for a private terrorism research organization [The Investigative Group], he was able to carry out his operations and the FBI greatly benefited from the knowledge he gained.

Ex. 7 (emphasis added).

During Joseph's time assisting the FBI, the government with his help successfully targeted Muslim organizations that had terrorist ties, among them certain members of the American Muslim Council and the World Assembly of Muslim Youth. Id. As a result, Special Agent Walczykowski notes:

> **Mr. Braude was almost ten years ahead of the Federal Government, the media and the American people in understanding the threat posed by many of these radical Islamic organizations. . . . Mr. Braude was a civilian counter-terrorist warrior, before this Country even realized the true nature of the threat.**

Id. (emphasis added).

Although Joseph's closest contacts were in the FBI, Joseph also provided intelligence to other government agencies like the CIA and the Manhattan District Attorney's Office. Joseph always made himself available to assist the government in its efforts to investigate international terrorist organizations.

Others who know of Joseph's deeds on behalf of his country note his courage and selflessness. His girlfriend at the time of his initial involvement with the FBI, other law enforcement agencies and The Investigative Group, Ms. Belton, explains:

> Joseph has always lived not just a regular good life, but an extraordinarily honorable one. I can remember many nights in college, when, long after I had fallen asleep, he stayed up to translate documents and write reports on fundamentalist organizations that threatened America. After the first World Trade Center bombing in 1993, he spent 20-hour days combing through documents left behind by the bombers to piece together the shreds of their organization. This was in the mid-1990's, long before such work was fashionable or high on the radar of our security officials. Over the years, I have often worried for his safety as he has gone to interview radical fundamentalists in this country and abroad who hate both Americans and Jews-but his ability to speak beautiful Arabic, to chant Koran, and to listen, has always protected him and enabled him to help our country. He has never shirked from trying to understand and then beat these terrorists, regardless of the considerable danger involved.

> Not only did Joseph spend years doing all he could to help break these organizations but he did it all in the shadows. In part for his own safety, and in part because he simply does not have a large need for recognition, Joseph quietly provided his information and understanding to individuals in the government who were prosecuting early terrorist cases, and to NGOs working more openly against these terrorist organizations, without asking for any acknowledgement.

Ex. 10 (emphasis added). Ms. Belton's mother, Judith Kleinfeld, also has high praise for Joseph's courage:

> Joseph Braude is courageously and intensely patriotic and has taken considerable personal risks to bring terrorist activities to the attention of the nation before 9/11. While he was going [sic] with my daughter, I recall that he translated Arab terrorist material for Steve Emerson who was at that time a lonely voice in the wilderness, trying to alert our nation to Islamic danger. This was not a position that offered much either in pay or recognition for Joseph. Indeed it offered considerable aggravation because Steve Emerson, who did not speak Arabic, was under immense pressure. Joseph continued with this work because of his love for the United States and because of his knowledge of the danger the nation faced and did not realize. . . .
>
> As an Arabic speaker who looks Middle Eastern, Joseph could and did attend conferences in the United States where terrorists were openly proclaiming their desire to destroy the country. They did so in the light of day, confident that Americans, non-Arabic speakers, would not understand what they were saying. Joseph picked up conference material to translate, learned of their activities, and brought these matters to the attention [of][sic] the relevant people. <u>Indeed, my major worry as I anticipated his marriage with my daughter was that she and their future children could be placed in mortal danger by Joseph's work on behalf of national security</u>.

Ex. 11.

Joseph truly was ahead of his time in terms of the invaluable and dangerous work he did investigating international terrorist organizations operating in the United States. We respectfully submit that this Court should consider his service to this country as an "extraordinary" factor in determining his sentence, one that strongly mitigates <u>against</u> incarceration.

### C. Joseph Braude is a Uniquely Loving Person

Despite coming from relatively modest means and having to deal with a difficult and broken home, Joseph made the best of tough times and throughout his life has been a devoted and loving son and brother and a wonderful and caring friend to many loyal and interesting people who have written to this Court on his behalf.

Joseph's exemplary commitment to his family became particularly evident during his mother's two painful divorces. Even though he was only a boy of twelve at the time of his mother's first divorce, he undertook tremendous adult responsibilities and was a pillar of support for his mother and brother. Joseph's mother writes of this period:

> During the hardship of my divorce to his father, Joseph, still age 12, tried to help find solutions to the strife and difficulties we faced. Here is one example of many: He walked a long distance on his own to talk with a neutral rabbi to ask for his intervention. It was helpful. From this time on, Joseph became a source of strength to me and to my younger son Yoni.

Ex. 12.

During Joseph's college years, he was there again for his mother and brother when his mother went through a second divorce. Indeed, his devotion to his family had never dissipated. Rather, it is the foundation his family relies on to this day. Joseph's mother explains:

> [Yoni and I] needed his help again when my second husband – a serial husband, if you will – left the state with his company underling, who apparently became his fourth wife. When I was devastated and completely hurt and beat, Joseph was there for me to give me strength and support. At that time, he was at Yale. . . . He helped me and his brother financially as well. As the years went by, he became a role model to his brother and the pillar of strength to both us, which basically is what is left of our family unit.

Id.

Joseph is a warm, caring and devoted brother. He was the older brother who "whenever he had a snack, he would split the portion and then he let [Yoni] choose which piece was [his]." Ex. 13, Letter from Yoni Braude. Describing Joseph's love and support during their mother's traumatic divorces, Yoni, Joseph's younger brother, writes:

> JoJo demonstrated great emotional leadership in our family when my mother and I could not. My brother and I endured a difficult divorce of our parents when we were young. JoJo comforted me because I knew he would be with me whether or not our parents were together. When our mother fell on difficult times in the late 1990s because of an excruciating divorce from our stepfather, <u>JoJo came home from college at Yale to help my mother through the ordeal, from meeting with lawyers and coaching my mother to organizing family counseling sessions. Joseph was a vital pillar during the period</u>.

<u>Id.</u> (emphasis added).

Joseph's outpouring of love and support to his family was not lost on others outside the family. Ms. Belton, Joseph's former college girlfriend and still a close friend, provides insight into Joseph's role as the *de facto* man of his family, affectionately referring to Joseph as a good kid:

> Joseph has always been an emotional mainstay in a family that faced more than its share of difficulties. He became the "man of the family" after his mother's first divorce when he was just twelve. He paid his own way through college, and has since helped his mother through a second messy divorce. She is now alone. His father, a very troubled man, has been too frequently more of a burden than a help. Joseph has had to be a pillar to his mom and often a father to his younger brother, Yoni. The emotional difficulty has taken a toll on his own mental well-being. <u>Despite all of this, Joseph has always tried, now matter how difficult things in his own life have been, to be a good kid. There is no fancier word for what he is</u>.

Ex. 10 (emphasis added). Ms. Belton's mother, Ms. Kleinfeld, adds:

> [Joseph's] family circumstances required Joseph to support his mother and father financially and emotionally rather than his family supporting him. Joseph has responded to what seems to me to be extraordinary burdensome parental

> needs and demands with selfless, and indeed incredible, responsibility and honor.

Ex. 11.

One of Joseph's childhood friends, Eitan Sabo, also writes of Joseph's concern and love for his family, particularly his younger brother:

> In those grade school days, when a little brother was more likely to get locked in a closet than be invited to play, Jojo was always eager to include his younger brother Yoni in our games. The love and loyalty that Jojo displayed for his little brother went beyond fun. After his parents' divorce, Jojo looked after Yoni, helping him with his school work and protecting him like a son. Jojo was always equally concerned for his mother who went through two divorces. . . . He would do anything for his family and often interrupted his studies and career in recent years to help and support them.

Ex. 5. Mr. Sabo's parents, Rhonda and Naftali, also note Joseph's concern for his brother and mother:

> A keen sense of responsibility for his family and friends has always been characteristic of Joseph. As we watched the family suffer through two divorces and difficult times, Joseph was steadfast in his loyalty and support. A sensitive and unusually perceptive young man, from a young age, it often appeared that Joseph bore the weight of caring for his mother and younger brother Yoni, as well as constantly worrying about his father's well-being.

Ex. 14.

Yoni's roommate at Harvard for three years and Joseph's friend, Zachary Shrier, is another person touched by the special closeness of Joseph's relationship with his brother and their deep feelings for their mother:

> I only came to understand the nature of this relationship. . . when Joseph visited Yoni at Harvard, and spent the day with us in our dorm. It is easy to remember what I saw when meeting Joe for the first time: there wasn't a whiff of sibling rivalry or competition between these two amazingly talented brothers; instead, they cared for each other, supported each other's endeavors, offered ceaseless emotional and material support and nurturing, and nourished each other with humor. . . . They spoke of their mother with exceeding tenderness and reverence, and discussed how best to support her – and be with her as much as possible – during her crisis [her second divorce].

Ex. 15.

While maintaining a hectic work and travel schedule at Pyramid Research, Joseph's strong and unwavering support and concern for his brother and mother never faltered. Joseph's roommate at the time, Franklin Zaromb, writes of how evident it was:

> I cannot recall a day that has gone by without Joseph being in contact with either Yoni or his mother Rita. Nor can I recall a conversation with Joseph regarding his future plans that did not boil down to concerns over how those plans might affect his mother or Yoni. . . . I can say from my own experience that Joseph is an extremely caring and loyal friend, brother, and son.

Ex. 16.

Joseph's love and support also extends to members of outside his immediate family. His aunt, Lois Dubin, writes:

> As an adult, [Joseph] has displayed care, sensitivity and devotion to his extended family. I myself have turned to him for advice about the adolescent and teen years, and he has reached out repeatedly to his younger cousins, our daughters, in friendly and supportive ways.

Ex. 17.

Joseph's kindness and sensitivity are not saved only for his family. Even when Joseph was young he is described as "display[ing] a thoughtfulness beyond his years" in his dealings with others. Ex. 5, Letter from Eitan Sabo.

A friend of Joseph's from high school, Samuel Kaplan, explains how Joseph was willing to reach out to those who struggled to fit in, revealing a uniquely caring and thoughtful nature:

> The bus route started near Joe's house on Elton Street and stopped picking up passengers soon after my stop on Hope Street. So the bus was nearly full by the time it got to my stop. I remember quite clearly that Joe would always save me a seat. On the bus, he and I would chat, talk about our classes, and tell jokes. . .As an underclassman, I struggled to gain acceptance of my peers. But Joe was different – he accepted me unconditionally – and he still does.

Ex. 18.

Ms. Kleinfeld provides yet another example of Joseph's kindness and his giving nature:

> To offer a personal example, my own family came from Eastern Europe and I knew virtually nothing about their origins. On a trip abroad, Joseph managed to find the particular village in Lithuania from which my family came, to talk with the villagers about the history of the Jews in the region, and to bring me a videotape of the village and his conversations with a great number of people who lived there. He also arranged for financial help to go to the people of the community when he returned to the United States. Joseph has an amazing ability to create trusting relationships across cultures because of his warmth and openness to others.

Ex. 11.

Even casual observers noticed Joseph's exceptional good and thoughtful nature. Rabbi Avi Shafran, Joseph's religious teacher at Providence Hebrew Day School, writes:

> He impressed me, and I think all who knew him, as someone not only intellectually gifted and immensely creative but as a true "good soul" – someone to whom kindness and concern for others comes naturally.

Ex. 19 (emphasis added).

As his former roommate Mr. Zaromb attests, Joseph was never too busy to help others:

> Despite his extremely busy work schedule, Joseph regularly took the time to ask how I was doing, cook a sumptuous dinner after a long day at work (Joseph is by the way, an excellent cook), provide helpful personal advice, read out loud a Mark Twain short story, lift my spirits by composing an impromptu song, or tell an entertaining story from his childhood or the Middle East.

Ex. 16.

After Joseph's book was published and he was stretched thin promoting it while still working full-time at Pyramid Research, Joseph never forgot his friends. Rather, he

made them feel as important and loved as ever. A longtime friend, Tally Zingher, observes:

> Even at the peak of [Joseph's] publicity efforts to market his book, he continued to be a compassionate friend. At one point in the spring of 2003, I suffered a leg injury and was unable to leave my home. [Joseph] came over, made some tea and kept me company, entertaining me and keeping my mind off my pain with funny stories.

Ex. 20.

As the letters attached to this memorandum amply demonstrate, the support, kindness and compassion Joseph showered on family members and friends is exemplary. We respectfully submit this is the first of the many reasons why this Court should conclude that a prison sentence is not warranted in this case.

**D. Joseph Braude is a Devoted Middle East Scholar**

Joseph has been fascinated with the Middle East ever since he was a child and as a result, he has intensively studied Middle East cultures, languages and societies for more than a decade.

As we briefly outlined above, Joseph's study of the Middle East grew out of his natural curiosity about his own Iraqi-Jewish heritage. As a first generation American citizen of Iraqi-Jewish decent, he wanted to cultivate ties to his mother's native country. Learning the languages (Hebrew, Arabic and Persian) and the history of the region was an obvious conduit to that goal and was something he pursued with vigor in college, at graduate school and beyond.

Joseph's devotion to the Middle East and related scholarly achievements are apparent to all who know him. Joseph's Arabic instructor at Yale, Bassam Frangieh, attests to the deep interest Joseph showed towards his studies of the Middle East, as

evidenced by their frequent contact. His learning did not end at the door of the classroom:

> During our four years of acquaintance, I found Mr. Braude to be responsible, punctual, pleasant, friendly, polite and very appreciative. As his teacher and mentor in his field of studies, I met with him in a variety of settings, in my office, in coffee shops, inside his college and at home. I used to talk to him about Arabic language and literature and he played Arabic music for me and sang songs.

Ex. 21.

Joseph showed the same dedication to Middle Eastern scholarship in graduate school at Princeton. One of his professors, Andras Hamori, writes of his accomplishments and potential:

> [Joseph] took with me a course of readings in medieval Arabic literary texts, and I was on the departmental committee examining him on his dissertation proposal. We also talked on professional matters on various occasions. I was extremely impressed by his work in my class. His knowledge of classical Arabic was excellent, and he brought to his studies a thoughtful, searching intellect.

Ex. 22.

A prominent Israeli scholar and businessman whom Joseph met during this time, Dr. Gil Feiler, was equally impressed with Joseph's scholarship. Dr. Feiler explains Joseph's love for the Middle East and his deep knowledge of the region:

> I first came across Mr. Joseph Braude as a guest of the United States Information Agency (USIA) in the 1990s where [sic] someone asked if I would be willing to advise him. A few months later, he contacted me and came to my office. I was very impressed by a promising, brilliant young scholar of the Middle East who showed outstanding abilities in the Arab language and rare enthusiasm for the history and culture of the Arab and Islamic world.

Ex. 23.

While in graduate school, Joseph spent time as a research fellow at the Juma Al-Majid Center for Culture and Heritage, a public repository of ancient Arabic and Islamic

manuscripts in Dubai. There he worked closely with Jassim Jirjees, the Deputy Chancellor, helping to preserve the manuscripts. Joseph's love for the Middle East was not lost on Mr. Jirjees either, who writes of Joseph's time there:

> [Joseph's] fluency in Arabic made him very close to all people around him. He has a great knowledge of the area, its history and folklore. His ability to sing in Arabic and play the Oud, an oriental musical instrument made him very popular among the people who know him; because only very few westerners usually have such artistic abilities.

Ex. 24.

Joseph's reputation as a Middle East scholar caught the attention of many prominent individuals. The Editor-in-Chief of *The New Republic*, Martin Peretz, writes:

> I had heard of Joseph Braude long before I met him. The tidings were about a meticulous scholar, an analyst of international relations. Since I, too, was interested in the Middle East, I was interested in him, especially when I heard that he had [sic] Hebrew and Farsi and Arabic and that he was one of those people who doesn't have deep opinions about places he cannot know in their language. When we finally met, he kept me alert for many hours. He knew the Arab world in ways that I did not.

Ex 25.

Although Joseph applied himself to the study of all of the Middle East and was lauded for his scholastic accomplishments, his first love was Iraq because of his heritage and it was his affection for it and its people that resulted in his book The New Iraq. The book was the result of Joseph's unwavering focus on his goals and his desire to contribute to the improvement in the lives of Iraqi citizens following Saddam Hussein's removal.

Mr. Peretz, by then a friend, made sure *The New Republic*'s imprint published Joseph's book and notes what a true accomplishment it was:

> The magazine has an imprint at Basic Books and together we decided that Joseph's literate, provocative and compelling presentation needed to be

> published. Although it challenged many stereotypes, it was extremely well-received. The former director of the CIA, James Woolsey, has written that our position in Iraq would now be more favorable if policy makers had read it more closely.

Id. (emphasis added); see also Ex. 26, Letter from James Levine. Indeed, James Woolsey had this to say about Joseph's book: **"I know of no other work in its league with respect to combing policy insights of this sort with an appreciation of the history and culture of Iraq."** Ex. 27 (emphasis added).

A friend and journalist, Ted Rose, remembers reading a draft of the book and what an impact it had on him:

> When Joseph showed me early drafts of his book, The New Iraq, I was stunned. At a time when cultural ignorance and political naiveté ruled, Joseph produced a work, in a few short months on furtive breaks form his fulltime job, that shattered the stale debate. While television commentators droned on about the possibility of war with Iraq, Joseph took that war and the American victory as his premise. He moved quickly to the much more penetrating question: what happens after? We now know, sadly, that he was one of the few people doing this work. (Joseph accurately predicted a protracted guerilla insurgency that would be stoked by the American occupation.) His book featured a confident, compassionate voice, that moved easily between engaging history and astute observations about modern politics to more speculative discussions of future development trends in post-conflict Iraq.[4]

Ex. 28 (emphasis added).

Another friend fondly recalls Joseph describing his plans for the book and how it grew out of his love for Iraq:

> As Mr. Braude described his plans for The New Iraq to me, he did not go into details of what it took to get a book deal, or what he hoped to gain from writing the book. Rather, he barraged me with detailed stories of Baghdad's glory days.

4 How poignant is it that this young scholar accurately predicted the chaos that would follow the U.S.'s "victory" over Saddam Hussein. Little wonder that a few days before Joseph's trial began, counsel spoke with a Pentagon official inquiring about Joseph's availability to work for this country's transition team that was being formed to advise the new Iraqi government. In a classic case of the "right" hand of the government failing to communicate with its "left" hand, the official quickly hung up when counsel asked him if he knew that Joseph's criminal trial in the Eastern District of New York was scheduled to begin that coming Monday.

> I remember Mr. Braude's description about the Baghdad philharmonic prior to the Ba'athist days in which he informed me that in the pre-Ba'ath days, there were a significant number of Jews in the Iraqi Philharmonic and this religiously diverse philharmonic was listened to regularly by ordinary Iraqis. He described the strong Iraqi education system and culture of literacy that gave Iraqis their reputation across the Middle East as being well read and highly literate. As he told these stories, it was obvious that Mr. Braude longed to see Iraq regain its glory days and believed that such return to tolerance and flourishing was possible. Furthermore, it was obvious that Mr. Braude was somebody who had the ability and desire to help Iraq in this development.

Ex. 20, Letter from Tally Zingher (emphasis added).

The book has not just been important to adults, but has been a useful educational tool as well. An old family friend, Rebecca Burr, writes:

> [Joseph] has written a scholarly book; The New Iraq, which is, at the same time accessible to children. We read it to our eight year old and 11 year old as one of the resources to educate us about the situation in Iraq and the Mideast [sic].

Ex. 29.

Joseph's interest in Iraq was not limited to the writing of his book. The President of The American Committee for the Rescue and Resettlement of Iraqi Jews, Heskel Haddad, recalls the time he spent with Joseph discussing the plight of Jews in Iraq after the fall of Saddam Hussein:

> I wanted to go to Iraq to investigate the situation there, but Mr. Braude was very generous with his time and advise [sic]. He told me that he will [sic] be willing to do the investigation for me in Iraq, which he did. He even offered to accompany me if I decided to go there.

Ex. 30.

Joseph's love for the Middle East is all consuming. He has devoted most of his life to trying to understand the region, its peoples and cultures, learning its languages and history. In so doing, he has achieved a reputation as a brilliant young Middle East scholar. We respectfully submit this Court should consider Joseph's scholarly

accomplishments when deciding upon a sentence and consider as well whether Joseph's talent and scholarship would perhaps be put to better use at a university (or in another academic oriented environment like a think tank) as opposed to a prison.

**E. Joseph Braude Has Successfully Addressed Psychiatric Issues**

On a trip to Israel in early 2000, Joseph suffered physical convulsions and fell into a confused mental state. Before this incident, Joseph had never showed signs of mental illness and had no difficulties navigating the challenges of life, including his mother's two divorces and the related emotionally and financially trying times. On his trip to Israel, however, dealing with an escalation in his estranged relationship with his father, the failure of a serious long term romantic relationship and a prodigious workload, Joseph suffered a mental breakdown. Joseph was hospitalized for two weeks in Israel where he underwent a battery of tests before being released and returning to the United States.

Once back in the United States, Joseph began four months of intensive psychiatric treatment with Dr. Paul Shield in Providence. Dr. Shield then saw Joseph once per week for two months and now only sees him once every six months to ensure that his medication is working and he remains mentally healthy.

Dr. Shield has diagnosed Joseph as suffering from Bipolar I Disorder, otherwise known as Manic-Depressive Illness. At that time of his breakdown, Joseph experienced a series of symptoms common to the disorder, such as agitation, inability to concentrate and detachment from reality.

Presently, Joseph's course of medication has been successful in treating his mental illness and after his initial round of treatment with Dr. Shield, he was able to

return to his old active lifestyle. Joseph has not suffered a relapse, despite the immense pressures of working full time while writing a book and the stress inherent in his arrest and the decision to abort his trial and plead guilty. Nonetheless, Dr. Shield notes that a sentence of incarceration would impose unique hardships on him because of his fragility. Dr. Shield explains:

> I have significant concerns for Joseph's mental health if he is incarcerated. He has a major vulnerability to deteriorate under stress. Given his psychology, prison conditions would be an extraordinary stress for him. If he is incarcerated, it would be necessary for him to continue to have his medications and he should have access to a psychiatrist, who is able to help him adjust the medications appropriately. Please do keep in mind that he would be at risk for deterioration.

Ex. 31.

We ask this Court to consider how Joseph's illness will make any sentence of imprisonment more of a hardship for Joseph than the average defendant. Joseph's mental illness is not raised as an excuse or defense to his criminal conduct, but it is a very good reason to conclude that incarceration is not appropriate.

### F. Joseph Did Not Purchase the Three Cylinder Seals for Personal Gain

It is clear that Joseph did <u>not</u> purchase the cylinder seals for personal gain. Joseph is not a collector of ancient art or artifacts. Further, Joseph is not a materialistic person nor is he preoccupied by personal financial gain. For example, when discussing Joseph's selfless service to this country through working with law enforcement officials to put a halt to international terrorist groups, Joseph's former girlfriend and longtime friend, Ms. Belton, explains:

> [Joseph] was paid very little for his help-far less than he could have received had he taken an official job with one of our security agencies, or requested a senior role at one of the NGOs he worked with. Money, possessions, and recognition were just never very important to Joseph.

Ex. 10.

Special Agent Walczykowski in describing Joseph's assistance of the FBI also notes Joseph's lack of interest in money and selflessness:

> [Joseph] carried out his efforts with little concern for his personal safety or monetary compensation. [Joseph] received no payments from me for his valuable information.

Ex. 7.

Joseph's uncle, Benjamin Braude, thoughtfully explains why it is apparent upon a consideration of all the facts and circumstances that Joseph purchased the seals, not for a nefarious purpose but to safeguard them:

> [Joseph] has told me that he intended to cut through the red tape and deliver the artifacts directly to his contacts in the Department of Defense. . . . Everything I know about my nephew, <u>his modest style of life, his devotion to erudition rather than conspicuous consumption</u>, his demonstrated patriotism, and his deep-rooted moral conduct, convinces me that this claim is sincere and genuine. Nothing he could gain from hoarding or selling these objects outweighs the advantages of turning them over to the authorities whom he personally knew to be reliable and trustworthy.
>
> However, despite all his talent and experience, Joseph is still a kid, a naive innocent, who somehow believed that he could waltz through US Customs, blithely ignoring normal procedures and requirements. Once confronted with his violations, he naively believed that people entrusted with enforcing the law, habitually and professionally trained to be skeptical, would accept his good intentions.

Ex. 2 (emphasis added).

Joseph's brother, Yoni, also eloquently illustrates why Joseph's motives could only have been altruistic. He writes:

> **From everything I know about Joseph, his case, and our shared family history and culture, I strongly believe and know that his intentions regarding the Akkadian seals were morally benign and altruistic. . . . Experiences, relationships, the performance of music, the creation of newspapers, the promotion of ideas, the publishing of books, the revitalizations of cultures, the rebuilding of countries, the engagement of**

> **Americans in the lives and welfare of people in the Middle East, the prevention of terror attacks by Islamist extremists, helping his government when they need him – these are Joseph's 'trophies.'**
>
> I can recount to you how grief-stricken Joseph, myself and our friends were when the Iraqi Museum was looted. I can attest to the continued concern Joseph, his friends, and I manifested when we learned that the US failed to recover artifacts that had been smuggled to collectors in Europe. Having a contraband artifact in his personal collection was certainly not a way for Joseph to earn social approbation in our community of intellectuals, activists, and reformers. His altruistic intentions provide solid grounds for clemency in his sentence.

Ex. 13 (emphasis added).

We respectfully submit that all available evidence indicates Joseph purchased the seals to make sure they were preserved. This does not excuse his criminal conduct; however, it merits this Court's consideration and is yet another factor weighing in favor of not sending Joseph to prison.

**G. The Three Cylinder Seals are of Minor Value**

Although the seals were looted from the Iraq Museum, and there can be no argument that society should take all the necessary and appropriate steps to shutdown the black market in looted artifacts, we believe this Court should also note that the seals in questions are of relatively limited value. As the PSR explains, "[t]he [g]overnment's expert valued the seals between $1,550 and $1,950, in total." Further, Harmer Johnson, one of the preeminent appraisers of ancient art and artifacts in this country and the expert Joseph retained, appraises the seals collectively at $1,200. PSR ¶ 8. Whichever appraisal is considered, the conclusion is the same: the seals are not very valuable.

It is also worth noting that the seals are not of great historical interest. Mr. Johnson explains:

> Having studied thousands of cylinder seals in public and private collections in the United States, Europe and Middle East, I can state with assurance that the three seals in this case are of exceedingly minor consequence. They are not rare, the carved images on these cylinders are commonly seen on seals of the third millennium BC, the aesthetic quality and condition of the subject seals is poor to mediocre, and they exhibit nothing of particular significance or note.

Ex. 32.

The limited value and minor distinction of the seals in no way excuses Joseph's actions, but we respectfully submit it is another factor favoring a sentence without incarceration.

### H. Joseph Still Has Much He Can Contribute to Society

Regardless of the sentence this Court imposes, the mistakes Joseph made on that fateful day in June 2003 have already exacted a <u>significant</u> punishment and already derailed the life of this loving, thoughtful and extraordinary young man. Instead of being able to provide much needed financial and emotional support to his family, his reputation is in tatters and he has been unable to support himself financially (forcing him to reside with his mother). For example, due to his arrest, Joseph has not been able to capitalize on <u>The New Iraq</u>'s initial success, as the many rewards of being a respected, published author are closed to him now that he is a convicted felon.

More importantly, despite his extraordinary accomplishments, as a result of a felony conviction, Joseph will now have grave difficulty securing a position befitting his immense talents. At the time of his arrest, the Bush Administration was about to hire Joseph to consult with the Pentagon on the <u>reconstruction</u> of Iraq, a position that would have been the fulfillment of all of Joseph's efforts as a devotee of the Middle East.

Indeed, shortly before his trial, the Pentagon contacted Joseph again, unaware of his legal predicament. Now, the government will never hire Joseph because his felony conviction and the notoriety surrounding his case make him a pariah. In addition, equally well-suited private sector employment often requires a security clearance and will, as a result of his felony conviction, be unavailable to him. Joseph will also have trouble finding employment teaching at a university or think tank, as all are sensitive to possible scandal and controversy. Thus, this young man, who seeks to support his mother in her retirement and to one day start a family of his own, must now at age thirty attempt to rebuild a career without following the career paths he is most qualified to pursue.

Letter after letter notes how much Joseph still has to contribute, not just to his friends and family, but to society as a whole, especially during this time when so many of the world's pressing issues center around conflicts in the Middle East. The letters strongly emphasize that a sentence that does not include any period of incarceration is essential if Joseph is to have any chance of success. For example, the former director of the CIA, Mr. Woolsey, writes:

> I believe Joseph still has much to offer this country and many contributions still to make in our understanding the Middle East. I believe that he has been harder on himself regarding events that have led to this sentencing than any prison term could lead him to be. <u>I would urge that this fine young intellect and committed patriot be given some other duty than a prison term to pay his debt to society. I believe that in that way we will all be far more likely to be benefited by further insights and positive contributions from him</u>.

Ex. 27 (emphasis added).

Consistent with the theme that Joseph still has much to contribute and has already paid a tremendous price for his misconduct, longtime friend, Ms. Belton, pleads on his behalf:

> Joe is only 29 years old. The media coverage of the trial has already destroyed his reputation-anyone who looks him up on the internet for years will be met with a host of stories on his smuggling. The felony conviction will dog him for the rest of his life. . . . He has already paid, and will continue to pay, a very heavy price for the poor judgment that led him to break the law.
>
> But he still wants to do some good. He still talks optimistically about ways he can contribute through his writing, as he did with his penetrating book on what was needed to help Iraq recover after the war. <u>I think that, so long as he does not go to prison, Joseph will continue to use his talents for the good of everyone around him. But I worry that his spirit will not survive the difficulties of incarceration. I fear that he will emerge, even from a relatively short sentence, a broken and embittered man. I hope there might be another way for him to pay his debt to society other than a prison term</u>.

Ex. 10 (emphasis added).

A former graduate school professor, Mr. Hamori, notes that Joseph has much to offer to the world of Middle East scholarship, especially if prison is avoided. He explains:

> Mr. Braude is a young scholar who has already added to our understanding of contemporary Iraqi society, and may be expected to make major contributions to that important subject in the years to come. If incarceration may be avoided, his promise will more likely to be fulfilled.

Ex. 22. For additional letters discussing Joseph's gifts and ability to contribute to society, see the letters attached as Ex. 33.

Although Joseph's life may never be the same no matter what sentence he receives, an understandable result of a felony conviction, a sentence without incarceration is the surest way of offering Joseph the best chance of resuming his life's passion, spreading knowledge of the Middle East and fostering peace and

understanding there and here in our own country, something we can all benefit from.

We respectfully request that this Court give Joseph that opportunity.

### I. Joseph Braude's Mother and Brother Plead for Leniency on his Behalf

Joseph's beloved family makes a special plea to this Court to show mercy when sentencing him. Joseph's mother, Rita, pleads to this Court:

> I would like to beg you to be lenient to my son and not, God forbid, to judge him to [sic] harshly.
>
> . . . .
>
> Joseph is so hard working, pure, honorable, and he so accepts responsibility for his error in judgment. Please, please, let him go on with his life. We had a very very difficult year since my son was arrested. I am sure my son will continue to dedicate himself to good cause, and, if you let him, he will surely continue to make an important contribution to rectifying the problems we now have in the Middle East.

Ex. 12.

Joseph's brother, Yoni, also pleads for leniency and mercy, noting what a wonderful person Joseph is and what a giving life he's led:

> I write to urge that you grant my brother, Joseph Braude, mercy and leniency in your sentencing and spare him any time whatsoever in jail. Joseph is a remarkable person who is dedicated to his family, friends, community and the Middle East. As a younger brother who has been very close to Joseph – or JoJo, as I call him – all my life, I can attest to his sterling character, generous acts, amazing talents, and warm soul – and I am horrified by what he would suffer from even one day in prison.

Ex. 13.

## THE CONSTITUTIONALITY OF THE SENTENCING GUIDELINES

The Supreme Court's decision this year in Blakely v. Washington raised serious questions about the constitutionality of the Guidelines. 124 S.Ct. 2531 (2004). In response to the turmoil this decision created, the Second Circuit recently held that until

the Supreme Court explicitly overturns the Guidelines it will continue to enforce them. U.S. v. Mincey, 380 F.3d 102, 106 (2nd Cir. 2004).

The era of the Guidelines may not last long though. On October 4, 2004, the Supreme Court heard two challenges to the Guidelines based on Blakely and may rule any day that the Guidelines are, at least in part, unconstitutional, particularly the use of enhancements not supported by facts found by jury beyond a reasonable doubt. In this case, there are two such enhancements that are of significance to Joseph's sentence: 1.) obstruction of justice; and 2.) the seals being deemed "cultural property." Joseph did not allocute to either of these "facts." In light of the Supreme Court's expected Blakely rulings, Joseph reserves his right to appeal any sentence relying on these enhancements, or any other enhancements this Court may find that are not included in the PSR (or its Addendum).

## CONCLUSION

We respectfully request this Court consider the combination of factors outlined in this memorandum when determining the appropriate sentence to impose. Weighing the nature and circumstances of Joseph's offense conduct with his remarkable and praiseworthy life, it is respectfully submitted that a sentence without incarceration is warranted.

Respectfully Submitted,

BENJAMIN BRAFMAN, ESQ.
Brafman & Ross, P.C.
Attorneys for Adam Rothman
767 Third Avenue, 26th Floor
New York, New York 10017
(212) 750-7800

By: ______________________
BENJAMIN BRAFMAN, ESQ.

DATED: November 10, 2004

cc: Deborah Sue Mayer, Esq.
(Assistant United States Attorney)

Mark Gjelaj
(Senior Probation Officer)

Joseph Braude