# Exhibit 11

Judith Kleinfeld
759 Cranberry Ridge
Fairbanks, Alaska 99712
kleinfel@alaska.net

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**RE: UNITED STATES V. JOSEPH BRAUDE 03-CR-1009 (ARR)**

Dear Judge Ross:

I am a professor of psychology at the University of Alaska Fairbanks and Director of the Northern Studies Program. I graduated from Wellesley College in 1966 and received a doctorate from the Harvard Graduate School of Education in 1969. My husband, a graduate of Harvard Law School, was a district judge on the U.S. Court of Appeals for the Ninth Circuit and is now circuit judge on that court. He is not writing because he has doubts about the propriety of one judge writing to another judge about a sentencing.

My knowledge of Joseph Braude comes from his relationship to my daughter, Rachel Kleinfeld Belton, who attended Yale College with

Joseph. He was her boyfriend for several years, he visited us for a week or so in Alaska, he traveled with our family to New Orleans to attend Jazzfest, we met him in New York, and we have been with his parents on many occasions, including his graduation from Yale. My husband and I expected our daughter to marry Joseph, and this marriage was planned. While they eventually did not decide to marry, my husband and I supported their relationship because of Joseph's fine character, his promising future, and his diligent and selfless work in support of the security of our country.

I have tremendous respect for Joseph Braude and enormous concern for him. I appeal to you for leniency because Joseph, despite his veneer of sophistication and cosmopolitanism, can be naive. Knowing Joseph as I do, it is easy to see how he could seem to others different from the kind of man I know him to be.

Joseph had to grow up very fast and assume a great deal of responsibility at a very young age. His family circumstances required Joseph to support his mother and father financially and emotionally rather than his family supporting him. Joseph has responded to what seems to me to be extraordinarily burdensome parental needs and demands with selfless, and indeed incredible, responsibility and honor.

Every time I have been with Joseph I have admired his sense of honor, his courtesy, his warmth, his gentleness, and his generosity to other people. To offer a personal example, my own family came from Eastern Europe and I knew virtually nothing about their origins. On a trip abroad, Joseph managed to find the particular village in Lithuania from which my family came, to talk with the villagers about the history of the Jews in the region, and to bring me a videotape of the village and his conversations with a great number of people who lived there. He also arranged for financial help to go to the people of the community when he returned to the United States. Joseph has an amazing ability to create

trusting relationships across cultures because of his warmth and openness to others.

I especially worry about a prison sentence as I fear a young man with Joseph's gentleness and lack of "street savvy" will be the target of abuse in a prison setting.

Let me close with another reason I appeal to you for leniency in avoiding a prison sentence: Such a sentence could be expected to embitter Joseph and to reduce his usefulness to the United States. He is a skilled Arabic speaker, reader, and writer and also knows many unusual Middle Eastern languages and dialects. On one of his visits to Fairbanks, we discovered from a world-known linguistics professor whom we are familiar with that Joseph knows a dialect of Arabic spoken only on an island off Yemen.

Joseph Braude is courageous and intensely patriotic and has taken considerable personal risks to bring terrorist activities to the attention of the nation before 9/11. While he was going with my daughter, I recall that he translated Arab terrorist material for Steve Emerson who was at that time a lonely voice in the wilderness, trying to alert our nation to Islamic danger. This was not a position that offered much either in pay or in recognition for Joseph. Indeed it offered considerable aggravation because Steve Emerson, who did not speak Arabic , was under immense pressure. Joseph continued with this work because of his love for the United States and because of his knowledge of the danger the nation faced and did not realize. He showed our family the film Steve Emerson made to alert the nation to the threat of Islamic terrorism and spoke with intense emotion about the risks we were heading toward and needed to avert.

As an Arabic speaker who looks Middle Eastern, Joseph could and

did attend conferences in the United States where terrorists were openly proclaiming their desire to destroy the country. They did so in the light of day, confident that Americans, non-Arabic speakers, would not understand what they were saying. Joseph picked up conference material to translate, learned of their activities, and brought these matters to the attention to the relevant people. Indeed, my major worry as I anticipated his marriage with my daughter was that she and their future children could be placed in mortal danger by Joseph's work on behalf of our national security.

Since 9/11 and since the recent threats to New York financial institutions, Joseph Braude's skills have become even more vital to our country. He is a man that the nation can trust in a fundamental sense and a man whom our nation needs. He has made a mistake and he acknowledges the seriousness of this mistake. He has suffered a great deal. The crucial issue, however, is our national security and a man like Joseph Braude, generous, honorable, patriotic, a skilled speaker of Arabic and other dialects, a man willing to risk his life for his country, and intensely loyal to the United States, is rare. We need him not to be embittered.

I thank you for considering this lengthy letter and for considering these points as you impose sentence. I hope very much for Joseph's sake, for his family's sake, and for our country's sake that you will see a way to mercy and leniency.

Yours truly,

Judith Kleinfeld

# Exhibit 12

**Rita Z. Braude**
**25 Langham Road**
**Providence, RI 02906**

6 September 2004

The Honorable Allyne R. Ross

United States District Judge

Eastern District of New York

225 Cadman Plaza East

Brooklyn, New York 11201

Re: United States v. Joseph Braude 03-CR-1009 (ARR)

Dear Judge,

My name is Rita Z. Braude, and I am the mother of Joseph Braude. I would like to beg you to be lenient to my son and not, God forbid, to judge him harshly.

I was born in Baghdad in 1944, the fifth of six children to two Jewish parents. When the State of Israel was established, Baghdad ceased to be safe for its Jewish community. Waves of "Farhood" (the Iraqi name for "pogrom") befell our neighborhoods. Homes were ransacked and burned by raging mobs, men were murdered in front of their children's eyes, and young girls were raped. My father attempted to cross the border with my oldest brother and sister, 11 and 12 years old, and he and my brother and sister were caught and put in Iraqi prison for months. After a few months when my two siblings were released, my mother and all six of us fled to Israel, waiting a year for my father to be released and join us.

Like many Jewish youth who came to Israel after the war of 1948, I was not aware of nor educated in school to look back at the culture and heritage our family left behind in the Middle Eastern diaspora. I only understood that my mother's grandfather was the Chief Rabbi of Baghdad. Assimilated into the predominantly Eastern European culture that the Israelis espoused, I managed after some hardship (putting myself through evening high school on the sidelines of a daily full-time job) to assume a fairly high administrative position at the Hebrew University and at the same time to work as a part-time broadcaster for Israeli radio and television.

I took a leave of absence from these two posts in order to come to Providence, Rhode Island and marry Joseph's father, the son of a rabbi who hailed from an Eastern European line of rabbis, whom I met in Jerusalem. While teaching at a Hebrew school in Boston, I attained a teacher's diploma and a Bachelor of Arts in Jewish education. When I started my Masters degree at the Harvard Graduate School of Education, I gave birth to my first son, Joseph. At that time I was working as a research fellow at the Harvard Semitic Museum, and my boss, Dr. Carney A. Gavin, a Catholic priest, visited Joseph and me at Beth Israel Hospital. He looked at Joseph, sighed, and whispered, "Oh Rita, he looks so wise."

Six months later, we visited my parents in Israel, and my infant son pointed to the light in the dining room and uttered his first words, in Hebrew, to my father: "Zeh Or (This is light)!". In a subsequent visit when Joseph was almost eight years old, he borrowed an Arabic language tape, memorized it on the flight, and spoke with my mother in charming Arabic from the first ten minutes of the tape.

Joseph's gift in languages, music, and writing became evident at a young age. When his father was unemployed and I lost my position at the University of Rhode Island, Joseph earned pocket money at age 12 by playing Bar Mitzvah gigs and publishing a community newspaper, "The East Side Variable," which was independent and profitable through the sale of ads to local merchants. The paper had a run of six years and financed his education at Yale.

During the hardship of my divorce from his father, Joseph, still age 12, tried to help find solutions to the strife and difficulties we faced. Here is one example of many: He walked a long distance on his own to talk with a neutral rabbi to ask for his intervention. It was helpful. From this time on, Joseph became a source of strength to me and to my younger son Yoni. We needed his help again when my second husband – a serial husband, if you will – left the state with his company underling, who apparently became his fourth wife. When I was devastated and completely hurt and beat, Joseph was there for me to give me strength and support. At that time he was at Yale, researching Islamic militant groups on behalf of various cadres in Washington, among other jobs which earned him some extra money. He helped me and his brother financially as well. As the years went by, he became a role model to his brother and the pillar of strength to both of us, which basically is what is left of our family unit.

Joseph helped rebuild our sense of family and identity as a worthwhile group of people with a proud lineage, tradition, and culture. In his first year at Yale, Joseph researched – through the Library of Congress, old manuscripts, and oral histories and interviews of older family members in Israel – all he could learn about my family. He then thoroughly studied the languages my father spoke – Hebrew, Arabic, and Persian – and the music, lore, and food to boot. He brought my identity to a full realization, so I could live as a stronger and healthier individual. His brother Yoni thrived on the information that Joseph brought to life, and later earned a scholarship himself to spend a year in Israel. Joseph was by now thoroughly involved in various projects in the heart of the Muslim world, while Yoni continued Joseph's research of our ancestry and proudly presented a paper on the history of Iraqi Jewry to his colleagues in Jerusalem. Joseph's journey back to our future gave Yoni and me renewed excitement about who we are and our potential for the future.

Dear Judge, telling you all this is almost admitting to you that my son's plight in this case is my fault. My son Joseph, for his love to me, his brother, his family in Israel, and his serious

commitment to the part of the world I came from, went back to Baghdad, and you know the rest of the story.

Joseph is so hard working, pure, and honorable, and he so accepts responsibility for his error in judgment. Please, please let him go on with his life. We had a very very difficult year since my son was arrested. I am sure that my son will continue to dedicate himself to good causes, and, if you let him, he will surely continue to make an important contribution to rectifying the problems we now have in the Middle East.

Sincerely,

Rita Z. Braude

Rita Z. Braude

# Exhibit 13

Yonatan E. Braude
2610 Hillegass Ave., Apt. 303
Berkeley, CA 94704
Braude@berkeley.edu

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Joseph Braude 03-CR-1009 (ARR)

6 September 2004

Dear Judge Ross:

I write to urge that you grant my brother, Joseph Braude, mercy and leniency in your sentencing and spare him any time whatsoever in jail. Joseph is a remarkable person who is dedicated to his family, friends, community and the Middle East. As a younger brother who has been very close to Joseph – or JoJo, as I call him – all my life, I can attest to his sterling character, generous acts, amazing talents, and warm soul – and I am horrified by what he would suffer from even one day in prison.

I graduated Harvard College in 1999 with a B.A. in Social Studies and am now a first-year law student at Boalt Hall School of Law, University of California, Berkeley.

JoJo has always been a loving and kind older brother to me, as well as a linguistic and musical genius, a person who has prevailed over adverse conditions, a bridge-builder among cultures, and a person with consistently good intentions.

JoJo has been an extraordinarily supportive older brother. When we were young, Joseph, who is three years my senior, was precocious and an amazing communicator, but he was first and foremost a good brother. JoJo captured the spotlight as a 10-year-old who could sing from memory with perfect pitch the works of Tom Lehrer, and Gilbert and Sullivan, as well as the Um Kulthum songbook. (Um Kulthum was a prominent Arab singer from Egypt.) But JoJo always left room for me to grow, patiently explaining the world to me and including me in his world of friends. I cannot underestimate the value of the education he imparted to me. I still remember the day Joseph was accepted to Yale. It struck me that if his hard work and perseverance resulted in acceptance at an Ivy League university, I too could strive for this goal. Three years later, I became valedictorian of my high school class of 248 students, a Presidential Scholar, and a U.S. Senate Youth Scholar; I was accepted to Harvard, where I received my B.A. *magna cum laude.*

Not only did Joseph inspire me to succeed, but he also provided an example of kindness and generosity. I still remember how whenever he had a snack, he would split

the portion and then he let me choose which piece was mine. Those who know Joseph will attest to his gentle demeanor and caring disposition. His concern and care for me was so great that when I went to the hospital with the croup as a child and he could do nothing to help me, he had to express his feelings by writing about it. The piece was later published by a national children's magazine.

In junior high and high school, JoJo wrote articles in his own and the state's newspaper that provided thoughtful insights to the community and served as a public voice for people who had few advocates and received little attention when they desperately needed it. At the age of twelve, JoJo started a community newspaper which grew and expanded for six years. Joseph wrote articles and editorials about local events and the mood in Providence, Rhode Island; he also sold advertisements to local businesses. His talents as a writer gained so much attention that *The Providence Journal*, Rhode Island's main newspaper, hired him as a columnist. The community in Rhode Island hailed Joseph not only for his excellent writing abilities, but also for his penetrating insight into the social issues affecting our community. People still say that a feature story he wrote, wherein he invited the six Providence mayoral candidates to join him for a computer game of "SimCity," affected the outcome of the primaries.

JoJo has brought happiness to his family, to the elderly, and to all those around him. Joseph was the only Braude grandchild to study Torah with our paternal grandfather Rabbi William G. Braude, a renowned Reform rabbi and interpreter of rabbinic literature. On Jewish holidays, my brother played accordion for the elderly at Jewish nursing homes.

JoJo demonstrated great emotional leadership in our family when my mother and I could not. My brother and I endured a difficult divorce of our parents when we were young. JoJo comforted me because I knew he would be with me whether or not our parents were together. When our mother fell on difficult times in the late 1990s because of an excruciating divorce from our stepfather, JoJo came home from college at Yale to help my mother through the ordeal, from meeting with lawyers and coaching my mother to organizing family counseling sessions. Joseph was a vital pillar during that period.

Not only is JoJo devoted to his family, he is dedicated to our country and to improving the lives of people in the Middle East and around the world. Since the age of 18, Joseph has dedicated his talents and skills to the twin goals of combating terrorism and educating others about the wonderful culture and potential of the Middle East. It is important to understand how this interest arose from our family background and history.

Our mother's family fled Iraq in 1951. The Aslan family in Baghdad experienced some wonderful periods in Iraq, while also enduring difficult times. At times, Jews were able to contribute greatly to Iraqi politics, business, and culture. Baghdad used to be nearly 40 percent Jewish, the Brooklyn of the Middle East. Ninety percent of the Iraqi National Orchestra was once Jewish; this band was the Dick Clark Bandstand of the Middle East, with a radio audience of over 60 million listeners. Our great-great-grandfather was the last Chief Rabbi of Baghdad to be appointed by the Ottoman system. But dark times fell on the Jewish community as Arab nationalists took control of Iraq and practiced intolerance against Jews and other minorities. In the 1950s, Iraqi authorities imprisoned our grandfather, aunt, and uncle just because they wanted to flee the country; our grandfather's electrical business was confiscated. Along with 120,000 other Iraqi Jews, with the help of the then-nascent State of Israel, our family managed to flee

Baghdad. Each member was allowed to take only a small suitcase. The nationalist Iraqi government took the rest, even ripping the small gold earrings from my six-year-old mother's ears.

Our mother's family had to start from scratch in Israel, the US, and Europe. Like many other immigrant families, we worked very hard in our studies, and we also received encouragement to follow our passions. JoJo came to love Middle Eastern culture, languages, and politics. He won fellowships from the US government to study Arabic in Egypt and Persian in Iran. While in Egypt, journalists he met were so amazed at this American's ability to play the oud and sing in Arabic that they got him a spot on a morning variety television show broadcast from Cairo. The interviewer said, "We in Egypt think that American youth are shallow materialists and don't care about Arab culture, but you change our perception of Americans so much."

His Arabic, as others will attest, is not only fluent, but also beautiful. In fact, he appeared on *Al-Jazeera* in Arabic as an ambassador of the US and as an Iraqi-Jewish American. JoJo lovingly translated Kuwaiti poetry for his senior thesis at Yale University. In the United Arab Emirates, Joseph worked to preserve medieval Arabic manuscripts, working with top scholars in the field dedicated to protecting and maintaining cultural treasures.

In college and beyond, Joseph helped the US government fight Islamist terrorism. So few Americans take an interest in learning the beauty and intricacies of Middle Eastern culture that the FBI needed to call on him for Arabic translation work and consulting projects. Agents would even meet with him at his dorm at Yale.

JoJo also dedicated himself to understanding the dynamics of politics and culture in the volatile region of the Middle East. Because our family was forced to flee Iraq as a result of prejudice that affected people of all backgrounds in Iraq, Joseph dedicated himself to building bridges between Arabs and Americans, and among Muslims, Jews, and Christians. Because in many of the countries to which he traveled, it was unsafe to reveal that he was Jewish, Joseph sought to organize interfaith initiatives in America, where it was feasible to do so. Joseph belongs to a rarefied class of American Jews who actually travel extensively in Arab lands. Some may tour Jordan or Egypt but Joseph spent months or years living in countries like Saudi Arabia and Iran where he had to conceal his Jewish identity to protect himself from the intolerance that killed Daniel Pearl. One can only imagine the incredible stress that JoJo experienced over a ten-year period when he had to make sure that nothing he did revealed his identity. (Eventually, Saddam's Iraqi government rejected his visa applications when it discovered he was a Jew.) When he was in Iran during Yom Kippur, he went on a canoe by himself into the center of a lake to chant Kol Nidre in the traditional Iraqi Jewish trope (which his ancestors had done for hundreds of years in Baghdad not far away, but now he had to do in secret).

In 2002, when it had become clear that a US invasion of Iraq was imminent, Joseph identified a gap in knowledge among Americans about Iraq. He set about writing a book called *The New Iraq: Rebuilding the Country for Its People, the Middle East, and the World*, which would serve as a guide for policymakers, soldiers, entrepreneurs, artists, social activists, and educators. JoJo wanted people to understand the vibrant, pulsing Iraq beyond the headlines about Saddam Hussein. He called on Americans from all walks of life to engage in a rebuilding effort that could help revitalize a country and

perhaps a region. In his appearances on national television and radio, Joseph educated Americans about the history and culture of the Iraqi people.

I remember JoJo's excitement during the writing process of the book. His excitement was contagious, and he enlisted many of our friends as research assistants – anything from getting books from the library to researching chapters in their areas of expertise. JoJo interviewed hundreds of Iraqis in refugee camps throughout the Middle East. He contacted exiles who wanted to help rebuild Iraq. He wrote compelling analyses of Iraqi history, economy, and culture. His allegiance was to an Iraq where Iraqis would prosper and develop their autonomy, not to any ideology. In the book, he publicly embraced his Iraqi Jewish heritage because he hoped that the future Iraq would be more similar to the multicultural Baghdad of the past where Muslims, Christians, and Jews lived together.

What a thrill when he was finally granted entry to Iraq. This was the first trip *any* family member had made to Iraq since we fled in 1951. I remember that he bought a camera specifically for the trip so he could take pictures of the neighborhood where my mother's family once lived and the synagogue where my great-great-grandfather had his pulpit. He interviewed the older generation in our family to get details to help him locate the house after fifty years of construction in Baghdad. I can't express my feelings upon watching video clips of JoJo at the home of the youngest Jew still living in Baghdad, footage of an 80-year-old Jew remembering our great-great-grandfather at the synagogue, and footage of a meal being shared by Iraqi Jews and Muslims which JoJo brought together. Days after returning from Iraq, Joseph gave a presentation with pictures to the American Sephardi Federation, to over 500 Jews from Arab lands who now live in America – sadly, those who remember Jewish life in the Middle East and North Africa are few and aging.

From everything I know about Joseph, his case, and our shared family history and culture, I strongly believe and know that his intentions regarding the Akkadian seals were morally benign and altruistic. Joseph wanted to restore those seals to the proper authorities and the Iraqi people the way he knew how; Joseph's motives were moral. JoJo had so much to risk and so little to gain by harboring any profiteering or collecting intentions regarding the seals that to ascribe him such motives is preposterous. Joseph collects very little from his trips abroad, other than the friendships and experiences he accumulates. Experiences, relationships, the performance of music, the creation of newspapers, the promotion of ideas, the publishing of books, the revitalizations of cultures, the rebuilding of countries, the engagement of Americans in the lives and welfare of people in the Middle East, the prevention of terror attacks by Islamist extremists, helping his government when they need him -- these are Joseph's 'trophies.'

At the time of his trip, I lived across the hall from JoJo in the same apartment building, and I have, of course, known him all my life: there were and are no trophies, trinkets, or art items of any significance in his rooms – just books, CD's, musical instruments, and the occasional poster. I can recount to you how grief-stricken Joseph, myself, and our friends were when the Iraqi Museum was looted. I can attest to the continued concern Joseph, his friends, and I manifested when we learned that the US failed to recover artifacts that had been smuggled to collectors in Europe. Having a contraband artifact in his personal collection was certainly not a way for Joseph to earn

social approbation in our community of intellectuals, activists, and reformers. His altruistic intentions provide solid grounds for clemency in his sentence.

Joseph is a rarity – a scholar who had the opportunity to save Iraqi artifacts. He has already been severely punished over the past year. He has endured credibility losses, been isolated from the scholarly community, and has lost tremendous job offers to work in the government and private sector. A prescient voice on the Middle East was silenced when he was not able to continue promoting his book and ideas. A few days before Joseph was arrested, he received a job offer from the US Office of Reconstruction to be a communications deputy for the Coalition Provisional Authority in Iraq. We can only imagine the good that Joseph would have been able to do had he been able to serve in this position.

Joseph's conviction will continue to be a severe punishment for him – Joseph, a scholar who loves the Middle East and Iraq, now carries the social stigma of felon, which is a barrier to future employment, credit, adoption, holding of public office, and exercise of democratic voting rights.

Joseph should remain a member of the free community of the US; he presents absolutely no threat whatsoever to Americans, given the highly unique nature of the offense. On the contrary, he is a valuable resource on Middle Eastern affairs and current events in Iraq whose liberty and reputation should continue to be assets to the American people. I also believe that it would be a great loss to America to restrict Joseph's travel to the Middle East for any more time.

Indeed, Joseph has already done a tremendous community service for the Iraqi people in his media appearances, by raising awareness about the plight and the great potential of Iraqis to build a prosperous, culturally vibrant state. I have seen dozens and dozens of letters from US military officers, soldiers, and others in government who have written Joseph to thank him for writing the book *The New Iraq*. For many people working on the reconstruction, Joseph's book became a handbook for "how to do good" in Iraq. I am also aware the an Arabic translation of the book recently hit the stands in Baghdad – the first authorized translation, I might add, as there were bootleg editions in circulation earlier this year. The Iraqi people have benefited from the penetrating insight, admiration, brilliant suggestions, and cautious optimism with which Joseph has written about the country in his book *The New Iraq*. When most analysts talked about Saddam and American politics, Joseph, through his book, was one of the only voices focusing the nation's attention on the amazing cultural heritage of ancient Mesopotamia and modern Iraq. Further punishment would send the wrong message to those, like Joseph, who work to build bridges between people of all cultures and dedicate their energies toward making the world a better place.

For all of these reasons, your honor, I ask that you show my brother JoJo the utmost mercy and leniency.

Sincerely,

Yonatan E. Braude

Yonatan E. Braude

# Exhibit 14

September 5, 2004

Naftali Sabo M.D. and
Rhonda L. Sabo, Psy.D.
15 Clarke Street, # 8
Newport, RI 02840

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Dear Judge Ross:

Re: UNITED STATES V. JOSEPH BRAUDE 03-CR-1009 (ARR)

My husband and I are writing this letter together on behalf of our close friend, Joseph Braude, as he faces sentencing.

I am a clinical psychologist in private practice in Providence, RI. I am President of the New England Society for the Treatment of Trauma and Dissociation, a non-profit professional society of mental health professionals. I am also a consulting psychologist at the SSTAR Mental Health/Substance Abuse Agency in Fall River, Massachusetts.

My husband, Naftali, is a physician who was in private practice in internal medicine in Newport, RI from 1987-2004. He now works in the VA Hospital Boston Healthcare System Brockton (Harvard U.) in geriatrics and medical consultation to the Dept. of Psychiatry. He is also a Medical Co-Director at the Phoenix House Substance Abuse Treatment Center in North Kingstown, RI. Naftali, who was born in Tel-Aviv, Israel, is a US citizen.

We met Joseph about 21 years ago, when we moved to Providence for my husband's fellowship, and were introduced to him and his parents. We became friends with his parents and our son and Joseph soon became fast friends as well. Joseph, who at the age of nine or ten years, was already interested in community affairs, history and culture, and was an excellent influence on our eight-year-old son. We were impressed by Joseph's generosity in helping our son (who liked math and sports) to be successful as they made up pretend radio shows, played music together, and so forth. One could not help but notice Joseph's extraordinary ability in writing, music and languages. But we were equally struck by his unusual kindheartedness, as he also enthusiastically involved our son and his little brother in the activities he invented, always thinking empathically about the role in which each child could feel successful.

We also recall that, in addition to behaving ethically himself, Joseph would stand up for ethical issues, in spite of the consequences. We remember one particular time (perhaps when he was in eighth grade or so) that Joseph stood up, at some risk to himself, to speak out in protest against the behavior of his religion teacher who had made slurs about other religious groups.

Joseph was not only concerned about people who he knew, but also for his community. The newspaper that he created and self-published, while still very young, and in which he wrote about local issues, was very well regarded in Providence.

A keen sense of responsibility for his family and friends has always been characteristic of Joseph. As we watched the family suffer through two divorces and difficult times, Joseph was steadfast in his loyalty and support. A sensitive and unusually perceptive young man, from a young age, it often appeared that Joseph always bore the weight of caring for his mother and younger brother Yoni, as well as constantly worrying about his father's well-being.

Our friendship has continued strong throughout the years and, although our son lives far away, our friendship with Joseph has remained solid. Although Joseph left RI for school, he frequently returned, and we have been guests in each other's homes and have met many times in recent years. We were impressed, although not surprised, by his prodigious achievements in Middle Eastern studies. He would play songs on the oud for us and sing in Arabic and Persian—and talk about his hopes for a future of peace and stability in the region.

Joseph always expressed to us his concern for the peoples and countries that he visited in the Middle East, and particularly, of his love of Iraq and its people. I think that all of his friends were concerned that (in his energy for life and boundless enthusiasm for meeting people and learning new things) Joseph would neglect his own physical safety. Yet we wished him well—because all of our experience with Joseph was that he is an exceptional person who had a talent for bringing people together for the welfare of all.

Please take into account our considerable experience of this loving and good-hearted young man when you make your decision. He is always in our thoughts and prayers.

Sincerely,

Rhonda L. Sabo

Rhonda L. Sabo, Psy.D.

Naftali Sabo

Naftali Sabo, M.D.

# Exhibit 15

LPL FINANCIAL SERVICES

**Steve Shrier**
Branch Manager
Financial Consultant
CA Ins. Lic. #0D16203

**Zachary Shrier**
Financial Consultant

400 S. Beverly Drive, Suite 450
Beverly Hills, CA 90212
Office: (310) 201-0200
Fax: (310) 201-5010
Toll Free: (888) 744-4343

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**Re: United States v. Joseph Braude 03-CR-1009 (ARR)**

7 September 2004

Dear Your Honor:

I write this letter, Judge Ross, as an appeal for clemency on behalf of my dear friend Joe Braude, whom I have known for eight years. Specifically, I wish to confirm that the soft-spoken sincerity and grace that Your Honor witnessed as Joe admitted his guilt on August 3rd represents the Joe Braude that I know and love. In fact, it encapsulates a particularly kind, loyal, and humble gentleman with a bounty of rare gifts. A find in this world, indeed.

Today, I work as an independent financial advisor in Los Angeles. Along with my father, Steve, I consult to over 100 clients nationwide on all issues of personal finance. Together, we manage over $60 million for these clients; we are honored to have earned their trust in us - and their confidence in our abilities. I am also a graduate of Harvard University with a degree in Near Eastern Languages, and it is through my friendship with Yonatan (Yoni) Braude, Joe's younger brother, that I first came in contact with Joe. Our friendship has grown independently from there, and has encompassed hundreds of interactions – personal, professional, social, religious, in scores of contexts over these years.

Yoni Braude was my roommate at Harvard from 1996-1999, and – as any former college student surely knows – that is quite an intimate relationship during particularly formative years. Yoni and Joe were slogging through a real trial in '96, as they supported their mother Rita through a very painful second divorce. Almost daily, I heard stories of Yoni's brother "Jojo" (Joseph) Braude, and the unique relationship the brothers enjoyed – especially in the hardest of times. I only came to understand the nature of this relationship a few months later, when Joe visited Yoni at Harvard, and spent the day with us in our dorm. It is easy to remember what I saw when meeting Joe for the first time: there wasn't a whiff of sibling rivalry or competition between these two amazingly talented brothers; instead, they cared for each other, supported each other's endeavors, offered ceaseless emotional and material support and nurturing, and nourished each other with humor: often references to the Star Wars films, funny personalities from their upbringing in Providence, and their mutual love for old-time radio and classic Hollywood horror flicks. They spoke of their mother with exceeding tenderness and reverence, and discussed how to best support her – and be with her as much as possible – during her crisis. Watching Joe and Yoni together is like witnessing the apotheosis of brotherhood; it moved me very much to see it in 1996, as it has moved me every time the three of us have spent time together since.

My career brought me back to Cambridge, MA, for a two-year stint in 2001, and I was fortunate to live just five short blocks from Joe for much of that time. We were frequent guests in each other's homes, often on Saturdays, when Joe would join me for a Shabbat meal accompanied by much singing and (over)eating. I always had dozens of questions for him; I wanted to know about his travels to the Middle East (my field of study in college) and the people he communed with in the Islamic World. Joe always worked to build – and be – a conduit between deeply divided cultures; he spoke about the gorgeous way he was treated by Saudi families, the struggle for civil liberties and religious pluralism in Iran occurring just out of view, and his affection for a great Egyptian reformer-playwright whom the West is just now beginning to discover. In this world that seems to stress the unbridgeable differences between our civilizations and highlight our harshest judgments of each other, Joe is one of the brave men who explain the best of America to the Muslim world, and vice versa. He moves mountains with his

patience, sensitivity, grace, and hopefulness. On Saturday nights, Joe would invite me back to his apartment – a cozy but spartan flat on Inman St. – for coffee or tea. We spoke of business, politics, technology, our love lives, all of the things that 20-something guys are consumed with. But with Joe, I always noticed an absolute lack of the fashionable cynicism, arrogance, and false pretenses that pass for chic too often. In their place were spirituality, commitment, loyalty, and humility – far rarer and more valuable currencies. I loved best when Joe would turn on his satellite feed of al-Jazeera and provide a real-time running translation for me. He understood – not just every word – but also all of the cultural nuances that actually mean everything in the Arabic press! His primary quest was for understanding. It was not for attention and certainly never for material luxury.

Joe was a ubiquitous presence at Cambridge's quaint Café 1369 during the months that he worked on The New Iraq. He loved to write among the commotion, and to see friends and neighbors wander in and out of the café. Even though he was working against frighteningly aggressive deadlines, Joe was somehow never too busy to close his laptop and chat with friend and stranger alike. His warmth and gregariousness lit up the room, and I will always recall the excitement and optimism that Joe exhibited when sharing a new paragraph, an idea, an interview with me in that cafe. He wanted his friends to partake in the excitement of his project's completion, even to the extent of taking me along to the studio where he taped live interviews for CNN and Fox News. He was also stunningly good during a live interview on al-Jazeera, and I believe that his interview was a first: an American Jew giving an interview *in perfect Arabic* to that network. I strongly commend the videotape of this interview to Your Honor's attention; it is clear that al-Jazeera's journalists are personally touched by Joe's eloquence, optimism, and humor.

Joe's lapse in judgment that caused him to transgress was nothing short of tragic. He and his family have suffered much for it – especially because his good name, his credibility and reputation, mean everything to him, but also because of the personal and professional opportunities his mistake has cost him. Because of Joe's remarkable track record of extraordinary self-sacrifice, love of law and country, and of good works domestically and abroad, as well as his full recognition of his blunder, there is not a trace of doubt in my mind that Joe has righted himself, and will stand in excellent stead with

the law going forward. I believe that depriving Joe Braude of his liberty would constitute an unduly harsh response that would deprive the community of one of its finest, most service-oriented young men.

Judge Ross, please know that it is my honor to vouch for the goodness and decency of Joseph Braude. Knowing fully and fully honoring your sworn duty to uphold the law, I respectfully submit to Your Honor this plea: If there were ever a case to judge mercifully a very fine person who has erred – Joe Braude's case is unquestionably it.

Sincerely,

Zachary Shrier

Zachary Shrier
Los Angeles, CA

# Exhibit 16

44 Bennett Ave.
Apt. 6C
New York, NY 10033

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

RE: United States v. Joseph Braude 03-CR-1009 (ARR)

October 4, 2004

Dear Judge Ross:

I am writing on behalf of my friend Joseph Braude. I am a Psychology graduate student at Washington University in St. Louis, MO, and I am currently living here in New York City, working in the Department of Neurology at the Albert Einstein College of Medicine on a one year project investigating early cognitive predictors of Alzheimer's disease. Please allow me to briefly describe some of my experiences with Joseph, because the Joseph I know is an extremely good and talented person, and I humbly ask that these qualities be taken into consideration in the sentencing process.

I have known Joseph and his brother, Yoni, for over five years. Yoni and I are former classmates from Harvard College, where I first met Joseph during one of his visits to Yoni. After graduating in 1998 and for the next few years, I met Joseph several times while living and working in Cambridge, MA. Within the last two years, I have come to know him not only as an acquaintance, but as a roommate, friend, and "colleague" as well. Joseph and I were roommates from September 2002 to August 2003, and I assisted Joseph in his research and fact-checking for *The New Iraq*.

As a former roommate, I can attest to Joseph's modest living style, exceptional character, and generosity. First, Joseph lives modestly. Our 2-bedroom apartment was minimally furnished with little more than the bare necessities—beds, dressers, one couch, a table, a few chairs, and several small bookcases. Our walls were bare save for one poster of a landscape painting. And while I would have enjoyed seeing souvenirs from Joseph's numerous trips to the Middle East, I had to settle for the little he had—a few samples of shampoo from hotels in Dubai and Saudi Arabia, Arabic music tapes, books, and a cracked Ude.

Joseph is a man of exceptional character and talent. While living together, I never ceased to be impressed by Joseph's warmth, intelligence, wit, humor, facility with languages, and last, but not least, musical talent. Despite his extremely busy work schedule, Joseph regularly took the time to ask how I was doing, cook a sumptuous dinner after a long day at work (Joseph is, by the way, an excellent cook), provide helpful personal advice, read out loud a Mark Twain short story, lift my spirits by composing an impromptu song, or tell an entertaining story from his childhood or the Middle East. I must admit that in all my years of living with roommates before, during, and after college, I had never been treated so well! In fact, Joseph would often joke that his

roommates soon get married after living with him, because they become so used to living with someone who actually takes care of them. And sure enough, I became engaged less than a month after my lease with Joseph expired, and I am now happily married.

It was also a pleasure for me to assist Joseph in his research for *The New Iraq*. Joseph is an extremely diligent, focused, and creative writer and thinker. It was inspirational so see how Joseph collected dozens of interviews with Iraqis and data from experts from a variety of fields and disciplines in only a few months and then write a complete book in less than a month. As one of his researchers, I felt that Joseph acted as a model mentor, treating me with the utmost respect and courtesy, while remaining focused on his writing timeline and dedicated to producing work of the highest standard. During the editing process, I was similarly struck by how well he took constructive criticism and by how hard he worked to humbly incorporate others' suggestions. And insofar as it is relevant to Joseph's professional qualities, I must also mention that he has offered helpful business advice for my father, an inventor, who is currently working under a Phase II SBIR contract from the U.S. Army to develop a highly portable and efficient air sampler for use in detecting low concentrations of nuclear, biological, or chemical weapons agents in the air. As my father continues to advance and commercialize this technology, I know that he will be able to count on Joseph for trustworthy help and advice.

Joseph is generous and caring to both friends and family. I can remember many instances in which Joseph treated friends and family members to dinner, drinks, or a movie, or invited them to stay in or use our apartment. Even more telling is the fact that Joseph lives for his mother and brother. I cannot recall a day that has gone by without Joseph being in contact with either Yoni or his mother Rita. Nor can I recall a conversation with Joseph regarding his future plans that did not boil down to concerns over of how those plans might affect his mother and Yoni. While those who have known Joseph for many years in his academic and professional pursuits can describe in detail his efforts and level of dedication and self-sacrifice to help the Jewish community, protect fellow Americans and promote peace, justice, and economic development in the Middle East, I can say from my own experience that Joseph is an extremely caring and loyal friend, brother, and son.

I recognize that Joseph has pled guilty and acknowledged his involvement in criminal conduct. Nevertheless, I still respect him and have a great deal of concern for him. I also believe that his criminal conduct is completely uncharacteristic of the Joseph I know. I ask for your mercy in delivering a sentence to Joseph. Thank you for your consideration.

Sincerely,

Franklin Zaromb

Franklin Zaromb

# Exhibit 17

SMITH COLLEGE

Department of Religion and
Biblical Literature
Smith College
Northampton, Massachusetts 01063
T (413) 585-3662 F (413) 585-3710

8 September 2004

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: US vs. Joseph Braude 03-CR-1009 (ARR)

Dear Judge Ross,

I fully concur with the letter written by my husband Benjamin Braude on behalf of our nephew Joseph Braude.

I would simply like to add a few additional personal comments.

I first met Joseph in the year before my marriage to my husband in 1977. In addition to watching Joseph grow up, I have come to know him as a young adult from his college days and onward. I know him to be a person of very sound character and of immense talent. Unfortunately in this instance he made a serious mistake that showed poor judgment. However, I have no doubt that he is intelligent, sensitive, and contrite enough to learn from this mistake, and that he can continue, as he before, to make valuable contributions to our society. His vast and impressive knowledge of Middle Eastern languages, history, and cultures, and his personal experience in several Middle Eastern countries, are resources too vital to be wasted; these critically important skills should be used immediately for the benefit of our country.

Joseph's high intelligence, creativity, and accomplishment have been evident ever since he was a young child. Whether in literature, writing, music or art, he always showed a seriousness of purpose, delight in the doing, and persistence in striving for mastery. He shares his gifts with others generously, for example, improvising at the piano during family gatherings and involving others in singing to everyone's great joy. As an adult, he has displayed care, sensitivity and devotion to his extended family. I myself have turned to him for advice about the adolescent and teen years, and he has reached out repeatedly to his younger cousins, our daughters, in friendly and supportive ways.

Fundamentally, Joseph is a very sweet person. I don't know if this basic quality of his emerges in the current setting and circumstance, but it is an important part of him.

I hope that these remarks, as well as the testimonials you receive from others who know Joseph in different capacities, will prove helpful in providing you with a fuller picture of this fine young man.

Sincerely yours,

Lois C. Dubin

Lois C. Dubin
Associate Professor
Department of Religion
Smith College
Northampton, MA 01063

# Exhibit 18

August 31, 2004
104 Cole Ave. #3
Providence, RI 02906

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**RE: UNITED STATES V. JOSEPH BRAUDE 03-CR-1009 (ARR)**

Dear Judge Ross,

My name is Samuel Kaplan. I am writing to you concerning my friend, Joe Braude, who has been my friend since 1989 when we befriended each other in high school, who you will be sentencing on October 25, 2004.

I am an engineering consultant. I graduated from Cornell University with a degree in mechanical engineering in 1997. I work for DataLogic Consulting, Inc. under contract with the State of Rhode Island. I work on compliance issues relating to the Bioterrorism Act of 2002 and on strategic planning for water utilities. In my present consulting role, I am entrusted with law enforcement-sensitive counter-terrorism intelligence from the FBI and from the Department of Homeland Security. I am a board-certified Engineer-In-Training. I recently accepted a full-time engineering position with the State of Rhode Island's Department of Environmental Management. In that role, I will be working to regulate water pollution.

I humbly and respectfully request your leniency in sentencing my friend, Joe Braude. I want to illustrate my request with a true story about my friendship with Joe - a story that is telling of his humanity, his kindness, and above all, his inherent goodness:

Joe and I attended Classical High School together in Providence, RI. Joe and I lived in the same neighborhood and took the same bus to school. The bus route started near Joe's house on Elton Street and stopped picking up passengers soon after my stop on Hope Street. So the bus was nearly full by the time it got to my stop. I remember quite clearly that Joe would always save me a seat. On the bus, he and I would chat, talk about our classes, and tell jokes. Even though Joe was one year ahead of me, he always treated me as an equal. He treated me in the same way he treats everyone else - with deference. His deferential way is the expression of Joe's benevolent, trusting, and trust-worthy nature. And that is precisely what makes Joe an exceptional person. Joe's friendship in high school came at a critical time in my life. As an underclassman, I struggled to gain the acceptance of my peers. But Joe was different - he accepted me unconditionally - and he still does.

Joe's criminal conduct is not characteristic of the Joe I know. Despite his present predicament, I still hold him in high esteem because of the consistent and supportive nature of his friendship with me and because of his humanity. I honestly don't believe that any good will come through sentencing Joe to a prison term. Joe possesses a brilliant, creative mind, and a disciplined work ethic. I am confident that Joe will be able to find work in his field of expertise if he is sentenced to probation or some sentence other than prison.

Your Honor, I humbly and sincerely encourage the court to deal mercifully with my friend Joe.

Sincerely,

Samuel Kaplan

Samuel Kaplan

# Exhibit 19

בס"ד

Agudath Israel of America
אגודת ישראל באמריקה

Rabbi Avi Shafran
*Director of Public Affairs*

August 13, 2004

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York, 11201

**RE: <u>UNITED STATES V. JOSEPH BRAUDE</u>**
**<u>03-CR-1009 (ARR)</u>**

Your Honor:

I am the director of public affairs for Agudath Israel of America, a national Orthodox Jewish organization, and am writing here with regard to Joseph Braude, who is scheduled for sentencing in October for the illegal importation of Iraqi artifacts.

I first met Joseph approximately fifteen years ago, when he was a middle-school student at Providence Hebrew Day School, where I taught religious subjects in the high school division. He impressed me, and I think all who knew him, as someone not only intellectually gifted and immensely creative but as a true "good soul" – someone to whom kindness and concern for others came naturally.

After he graduated high school, to continue his education and eventually earn degrees from Yale and Princeton universities, I accepted my current position with Agudath Israel and, with my family, moved from Rhode Island to New York. Joseph, to my pleasant surprise, stayed in touch, calling on various occasions to ask me a question or just to let me know how he was doing. The Joseph I heard on the phone was the very same one I remembered, earnest, concerned and the consummate (please excuse the Yiddishism, but it is the perfect word here) *mensch*.

Joseph has accomplished much despite his tender years. He had, and I believe still has, great potential for future accomplishments that will accrue to the good of both our country and the larger world. The crime he committed, and for which I believe he is genuinely contrite, is a most tragic obstacle he thoughtlessly placed on the road of his life. He cannot erase it, unfortunately, but I respectfully ask that you help him minimize the considerable impact it has already had on his future, by showing leniency and compassion for him at his sentencing. Prisons are not made for gentle, good-hearted and sensitive young men like him.

Thank you for your consideration of my sentiments.

Respectfully,

Avi Shafran

Rabbi Avi Shafran

# Exhibit 20

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**Re: United States v. Joseph Braude 03-CR-1009 (ARR)**

September 8, 2004

Dear Your Honor,

I have known Mr. Braude for approximately 6 years. I met Mr. Braude at Harvard Hillel during one of Mr. Braude's visits to his brother Yoni, in the middle of my Junior year of college at Harvard. Mr. Braude's warmth of personality, enthusiasm for his field of study (Middle Eastern studies) and eagerness to share that enthusiasm with others made an immediate impression on me.

I am currently a graduate student in Harvard Law School's JD program and the John F. Kennedy School of Government's Masters in Public Administration in International Development program. I am pursuing this academic track with the hope of bridging both degrees in a career in US economic foreign policy, with a focus on the Middle East. I recently returned from a summer job at the International Criminal Court in the Hague, in which I served as a law clerk for the Chief Prosecutor of the International Criminal Court, Luis Moreno Ocampo. My previous employment experiences have included the US Department of Treasury's International Affairs Division, the US State Department, two years as an Investment Banking Analyst and summer internships at Israeli and Jordanian NGOs.

I reconnected with Mr. Braude at a Jewish holiday (Simchat Torah) celebration four years later in the fall of 2002. When we met, the same warmth and enthusiasm was still there. This time, the enthusiasm shined through in Mr. Braude's description of his recent experiences working on his main passion – the same issue he eagerly discussed years earlier– the Middle East. As he described his travels, language skill development and work on Middle East-related issues, I could not help but be a bit envious to see somebody who was not only strikingly intelligent and academic, but also able to bridge his passion with the real world and had the guts to take the right steps (living in Dubai, working as a Middle East telecom specialist, even getting a satellite television in order to watch Al-Jazeera) towards making a real contribution to the world with the knowledge he had acquired.

As we reconnected, Mr. Braude told me about the good news of his recent book contract which was going to be a channel through which he could put his acquired expertise to good use. When he described his ideas for The New Iraq I was struck by how much initiative Mr. Braude had and how intent he was on putting his energy and ability towards good and towards improving Iraq. While my classmates and I spent out time in the library thinkinkg about how to make this world a better place, I was confident that through Mr. Braude's book and other work, he really *would* make Iraq and the world a better place.

As Mr. Braude described his plans for The New Iraq to me, he did not go into the details of what it took to get a book deal, or what he hoped to gain from writing the book. Rather, he barraged me with detailed stories of Baghdad's glory days. I remember Mr. Braude's description about the Baghdad philharmonic prior to the Ba'athist days in which he informed me that in the pre-Ba'ath days, there were a significant number of Jews in the Iraqi Philharmonic and that this religiously diverse philharmonic was listened to regularly by ordinary Iraqis. He described the strong Iraqi education system and culture of literacy that gave Iraqis their reputation across the Middle East as being well read and highly literate. As he told these stories, it was obvious that Mr. Braude longed to see Iraq regain its glory days and believed that such return to tolerance and flourishing was possible. Furthermore, it was obvious that Mr. Braude was somebody who had the ability and desire to help Iraq in this development.

Mr. Braude told me that he was looking for research assistants for The New Iraq and when I expressed interest, we scheduled a meeting in which Mr. Braude showed me his book proposal and gave me a more detailed understanding of his perspective on the potential of The New Iraq. His enthusiasm, eagerness and commitment to use his skills and insight to improve the lives of Iraqis were contagious. I was swept away by his vision for a more free and developed Iraq and inspired by Mr. Braude's commitment to creating new opportunities for Iraqis, I couldn't help but want to be a part of this endeavor. I hoped that some of his intelligence, commitment to his passion, and ability to turn his knowledge and insight into something constructive for the betterment of a people would rub off on me.

In the months of intense work that ensued, the passion and focus that I initially saw in Mr. Braude were reinforced. I came to admire Mr. Braude for his expertise in Middle Eastern studies, Arab history and the politics and culture of Iraq, and for his ability to translate his bubbling enthusiasm for the project underway into clear strategy for completing his book. The research and writing

period for the book were particularly short and lasted only a few months. In that period, Mr. Braude had to harness the efforts and commitment of his research assistants in order to get the job done well and quickly. It speaks to Mr. Braude's strength as a manager and concern for each of us as individuals that the research assistants not only stuck with the book project, but felt real ownership and pride in the project. I recognize that it was because Mr. Braude did not lose is kindheartedness or passion in the midst of the hectic and stressful book-writing period, that I stayed motivated to help the project until it was completed and felt a real sense of ownership when The New Iraq made it to the bookshelves.

Even at the peak of Mr. Braude's publicity efforts to market his book, he continued to be a compassionate friend. At one point in the Spring of 2003, I suffered a leg injury and was unable to leave my home. Mr. Braude came over, made some tea and kept me company, entertaining me and keeping my mind off my pain with funny stories.

When the war in Iraq broke out in the Spring of 2003, Mr. Braude looked to share the knowledge he had acquired over the years and in the writing of The New Iraq with those who would find his knowledge practical and constructive through appearances on radio and television stations such as FOX as a war commentator. I joined Mr. Braude on one of his overnight FOX appearances which happened to take place on the day that the Iraqi museums were first pillaged. Much of Mr. Braude's commentary that night, both on the air and in private conversation, was about how disturbed he was by the destruction of Iraqi heritage and the looting of Iraqi treasures. He stated how important it was that the American government reach out to people from different disciplines who understood Iraqi society and civilization to help stop the looting.

It is with this familiarity and fondness of Mr. Braude that I write with confidence that his criminal conduct is entirely uncharacteristic of Mr. Braude as I know him. The only way that I can reconcile the actions for which he plead guilty with Mr. Braude's personal characteristics is that his actions were an attempt at furthering the best interest of the Iraqi people. Although I know that Mr. Braude violated the law, I believe that Mr. Braude had no corrupt motive in his actions.

It is because of my confidence in Mr. Braude's character and my realization that in the midst of the current situation in Iraq, the American efforts and Iraqi people need people like Joseph Braude that I am writing to express my feelings that a sentence of incarceration of Mr. Braude is

unwarranted. If the goal of incarceration is to protect society, incarceration in Mr. Braude's case seems unwarranted because Mr. Braude does not post a threat of continued violation of the law or harm to society. If the goal is to punish the offender, incarceration is unwarranted because the personal difficulty that Mr. Braude has endured this last year and the effect of his actions and his guilty plea on the career he has committed his life to seems punishment enough. If the goal of incarceration is the loss suffered by society due to Mr. Braude's infraction, incarceration is unwarranted because the coins themselves have not been destroyed and can be returned to the appropriate authorities. I also believe that imprisoning Mr. Braude is unlikely to have any deterrent effect. The extent to which this case was pursued sends a strong message about how seriously the US government takes artifact theft. Incarcerating him would not strengthen the message.

Essentially, the main loss to be suffered if Mr. Braude's was incarcerated would be society's deprivation of Mr. Braude's skills. Mr. Braude has much to offer the United States of America, especially at a time when experts in Mr. Braude's field are in high demand due to the terror threat and war in Iraq. To keep Mr. Braude from contributing to society at his maximum ability would be a loss to Mr. Braude, his friends and family, and to America.

Sincerely,

Tally Zingher

# **Exhibit 21**

August 17, 2004

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

RE: UNITED STATES V. JOSEPH BRAUDE 03-CR-1009 (ARR)

Your Honor:

I was the Arabic instructor of Mr. Joseph Braude in several intensive Arabic language courses at Yale University, from 1993-1995. These courses met daily, and I also served as his mentor on his senior project. Throughout his studies at Yale University, I had frequent contact with Mr. Braude. During his senior year, I met with him regularly while advising on his senior project, which was a requirement for graduation in the Near Eastern Languages and Civilizations Department.

During our four years of acquaintance, I found Mr. Braude to be responsible, punctual, pleasant, friendly, polite and very appreciative. As his teacher and mentor in his field of studies, I met with him in a variety of settings, in my office, in coffee shops, inside his college and at home. I used to talk to him about Arabic language and literature and he played Arabic music for me and sang songs.

He introduced me to his mother and his girl friend. On his last evening at Yale, he invited me to dinner to express his deep appreciation for our friendship and the impact that I played on his life as an educator. Although I have not spent time with him in the years since he was my student, he has continued to express his appreciation to me as teacher and mentor.

Mr. Braude has pled guilty and acknowledged his involvement in the criminal conduct charged. I would like to plead for mercy and leniency on his behalf. Mr. Braude has already learned from his wrongdoing. A merciful sentence would be sufficient to make him contemplate on and reflect upon his future. I therefore plead for a merciful sentence.

Sincerely,

Bassam Frangieh
Senior Lector of Arabic
Department of Near Eastern Languages and Civilizations
Yale University

# Exhibit 22

Princeton University

**Near Eastern Studies Department**
Jones Hall
Princeton, New Jersey 08544-1008
Telephone: 609-258-4280
Fax: 609-258-1242

August 26, 2004

The Honorable Allyne Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Dear Judge Ross,

I write with reference to the case of Joseph Braude who has pleaded guilty in a case now before you. I have taken the liberty of submitting these remarks to your consideration in the hope that the light they throw on Mr. Braude's character may, subject to your judgment, contribute to a case for leniency.

I have known Mr. Braude since he entered the Ph.D. program in the Department of Near Eastern Studies at Princeton University in September 1997. This is the department in which I have taught since 1967, and which I currently chair. He took with me a course of readings in medieval Arabic literary texts, and I was on the departmental committee examining him on his dissertation proposal. We also talked about professional matters on various occasions. I was extremely impressed by his work in my class. His knowledge of classical Arabic was excellent, and he brought to his studies a thoughtful, searching intellect.

During his years at Princeton I never heard of, or experienced, any action on his part that would have cast the slightest doubt on his being an upright and honorable person. He was devoted to his studies, and demonstrated great promise as a scholar. The events of recent years have shifted his attention from the medieval history of the region to the modern Middle East, especially Iraq. As a result, he has not so far written his dissertation (though he has completed all other requirements for the Ph.D.), but he has showed me the typescript of a knowledgeable and insightful book he has written on Iraq.

From what I know of Mr. Braude's character and sensitive personality, all of it quite alien to criminal conduct, it is my belief that a sentence of probation would be an effective response to the crime to which he has pleaded guilty, and that he would most certainly never again be involved in anything of the kind. I also believe that leniency would serve the public interest in this case. Mr. Braude is a young scholar who has already added to

our understanding of contemporary Iraqi society, and may be expected to make major contributions to that important subject in the years to come. If incarceration may be avoided, his promise will more likely to be fulfilled.

Respectfully,

Andras Hamori
Professor and chair

# Exhibit 23

ipr Info-Prod Research (Middle East) Ltd.
Tel: +972-(0)3-6448977 • Fax: +972-(0)3-644 8981 • e-mail: office@infoprod.co.il

11 August 2004

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**Re: UNITED STATES V. JOSEPH BRAUDE 03-CR-1009 (ARR)**

Dear Judge Ross,

I am a scholar of the Middle East, presently serving as a Senior Research Associate in Bar Ilan University, Israel, as well as working as Managing Director of Info-Prod Research (Middle East) Ltd and Editor-in-Chief of ipr Strategic Business Information Databases – two companies that I founded. Both these companies sell economic and business information on the Middle East to leading Fortune 500 companies and leading news agencies such as Reuters, FT and Factiva.

I received my Phd from Tel Aviv University in Middle Eastern economics in 1989 and since then have worked in several academic institutions and lectured worldwide, including annually at the World Economic Forum in Davos.

I first came across Mr. Joseph Braude as a guest of the United States Information Agency (USIA) in the 1990s where someone asked if I would be willing to advise him. A few months later, he contacted me and came to my office. I was very impressed by a promising, brilliant young scholar of the Middle East who showed outstanding abilities in the Arab language and rare enthusiasm for the history and culture of the Arab and Islamic world.

I built up a collaborative relationship with Mr. Braude over the succeeding years. He reviewed some of my articles and in the context of my company, I gave him some research projects. Much later, I also undertook a project for him.

A particular fruitful area of cooperation was fostering tolerance and building bridges between Israelis and Arabs. Both in our work together and in projects that Mr. Braude undertook separately, in a variety of interactions and projects, he worked tirelessly to build personal contacts between Israelis and their neighbors near and far in the Muslim world. Mr. Braude worked thanklessly and, because of his rare abilities and personality, had a significant impact.

ipr Info-Prod Research (Middle East) Ltd.
Tel: +972-(0)3-6448977 • Fax: +972-(0)3-644 8981 • e-mail: office@infoprod.co.il

Throughout the ten years I have known Mr. Bruade, he has proven himself to be a brilliant scholar and linguist, sensitive and caring individual, enthusiastic, but at times somewhat naive. His parents are divorced and his background is not simple. He demonstrated endless devotion and responsibility to his mother and younger brother.

I am aware that Mr. Braude has pled guilty. Despite his actions, and his most uncharacteristic and surprising behavior, I still respect the man for his sincere devotion to his professional area of study and his capabilities as a scholar. I truly hope that the court will have mercy on this deviation in Mr. Braude's otherwise most distinguished, honest and upright conduct. I truly believe Mr. Braude is an asset to the field of scholarly research in the Middle East.

Yours Sincerely,

Gil Feiler

Dr. Gil Feiler

# Exhibit 24

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**Re: United States V. Joseph Braude 03-CR-1009(ARR)**

Dear Judge Ross,

My name is Jassim M. Jirjees. I am a professor of Library and Information science. I got my doctorate from Rutgers- the State University of New Jersey in 1981 (www.jirjees.net) .Due to the difficult situation in Iraq during the 1990s. I had to leave my country. I worked in Sana' University in Yemen as a department head and then moved to Dubai in 1999 where I worked in Juma Al-Majid Center for Culture and Heritage as a deputy Chancellor.

The Center, a Charitable body of public benefit, it contains more than a half million documents including manuscripts, dissertations, books, documents, and other various information sources of knowledge both in paper and electronic formats (www.almajidcenter.org ) . Juma al Majid Center is one of the major repositories of medieval Arabic and Islamic manuscript in the Gulf region. There I knew Mr. Joseph Braude who came to the center as a research fellow. In his capacity as a research fellow he was entrusted with access to all libraries and collections at the center and he was faithful to that trust throughout the period of his stay in Dubai.

Joseph fondly enjoyed accompanying American and other Western visitors to the Center in a tour of the "Mustashfa ", the manuscript hospital." which was dedicated to the preservation and repair of medieval manuscripts. He was privileged on some occasions to explain the workings of the manuscript hospital to visitors and highlight its value.

As your highness may know, Dubai is predominantly a capital of commercial activity in the Gulf region, but despite the allure of business opportunities throughout the city, Joseph devoted his time to scholarship and to the welfare of Arabic and Islamic Culture and its preservation. In doing so he demonstrated his adherence to a moral code that heavily favors learning and spiritual values over materialism and retentions. It is worth mentioning that Joseph's favorite piece of calligraphy on display at the center was the Arabic proverb, "Rutbat al-'Ilm A'la

'Rutba." ("knowledge is the greatest reward," and his favorite line of Qur'an which he chanted on several occasions was" a- laysa '-llahu be-kafin ' abdah" (Is not God alone sufficient for his servants) Joseph was respected by all the staff members in the center because of his good manners and the great respect he showed towards others.

His fluency in Arabic made him very close to all people around him. He has a great knowledge of the area, its history and folklore. His ability to sing in Arabic and play the Oud, an oriental musical instrument made him very popular among the people who know him; because only very few westerners usually have such artistic abilities. Joseph got acquainted with two of my three sons who were university students at that time in Dubai. They are American citizens. They were born in New Jersey. Joseph encouraged them a lot to continue their higher education in the States. They learnt a lot about United States through him. In short, he behaved like a big brother to them. Joseph was a family friend. He used to visit us at our home in Dubai. We used to have very interesting discussions about Iraq.

I have known Joseph for almost four years. Since he left Dubai we had very long conversations over the phone. We used to communicate either through e-mails or over the telephone. He came to Dubai a couple of times. We used to meet when he visited Dubai. He sent me a copy of his outstanding book entitled, the new Iraq: Rebuilding the country for its people, the Middle East, and the world. Once he called me to tell me that he was going to appear in a program named from Washington that was aired live by Al-Gazeera Satellite Station. The interview went very well and some of my colleagues who happened to watch the program were fascinated by Joseph's knowledge and his command of Arabic language. I was also impressed by the good reviews that the book got. Thousands of people praised the book and its author. As a librarian I believed that very few people during recent years got such a good reputation, as Joseph did by writing his book.

When I first heard of what Joseph did I was really shocked. I have never thought that a fellow like Joseph will commit such a crime. Such things do not usually happen in real life. So when I talked to Joseph over the phone, he explained to me what happened and the way he reported his story and the honesty and sincerity he showed in reporting the story to me made me believe every word he said.

I understand that Joseph had already acknowledged his involvement in the criminal conduct charged with and despite the serious nature of the crime I still believe that this criminal conduct is completely uncharacteristic of the man I know him to be, a man dedicated to his family, friends, community, and above all the country he loved, Iraq.

I have a strong belief in your fairness, and wisdom. I do hope that Joseph's case will come to a very good end. And that will enable Joseph to continue his great career and build up on the good reputation he has already got by writing that notable book. Moreover, by doing so, the American criminal system, provides another example of its respect & appreciation to young Americans who accomplish something special for their country.

I may conclude my letter to you by referring to a beautiful line in al Qur'an which states that we should judge a person based on the whole of his deeds rather than a minor blemish.
I avail this opportunity to send you my best regards.

Jassim Jirjees

Dr. Jassim M. Jirjees
Library Director
Center for Documentation & Research
Presidential Court, Abu Dhabi
United Arab Emirates
12/9/2004

# Exhibit 25

THE NEW REPUBLIC

MARTIN PERETZ

20 Larchwood Drive
Cambridge, MA 02138

August 19, 2004

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11202

RE: UNITED STATES V. JOSEPH BRAUDE 03-CR-1009 (ARR)

Dear Judge Ross:

I have been for now thirty years the Editor-in-Chief of *The New Republic* and until my retirement three years ago I was a Lecturer in Social Studies at Harvard University. In both of these positions I have had the opportunity to judge mostly younger people on their intellectual gifts, their personal depth, their psychological authenticity and honesty.

I had heard of Joseph Braude long before I met him. The tidings were about a meticulous scholar, an analyst of international relations. Since I, too, was interested in the Middle East, I was interested in him, especially when I heard that he had Hebrew and Farsi and Arabic and that he was one of those people who doesn't have deep opinions about places he cannot know in their language. When we finally met, he kept me alert for many hours. He knew the Arab world in ways that I did not. It is an expression of his love of country that he has shared with our intelligence agencies information and perspectives that, alas, they did not grasp or take to heart. I do not know an enormous amount about his work for our government. He is too discrete for that. But I know from others that he has been an energetic and learned citizen, eager to share what he knows.

Joseph had written for *The New Republic*. It was I who was the first in the publishing community to read his manuscript of *The New Iraq: Rebuilding the Country for Its People, the Middle East and the World.* The magazine has an imprint at Basic Books and together we decided that Joseph's literate, provocative and compelling presentation needed to be published. Although it challenged many stereotypes, it was extremely well reviewed. The former director of the CIA, James Woolsey, has written that our position in Iraq would now be more favorable if policy makers had read it more closely. Joseph has made himself an expert on terrorism, not at all flashy, calm, allergic to panaceas, challenged by nuance. Frankly, there is a terrible thirst in our country for

August 19, 2004

just his talents. I shudder to think that his knowledge and insight will be sidetracked and isolated by this dreadful episode. One reason it is so dreadful is, I believe, that it was a fluke because he is so respectful of the law, of general probity and of the societies about which he has learned so much.

Your honor, I have been around Harvard long enough to remember how young people ruined their lives in egregious behavior during the 'sixties. Many of them cut ties or had their ties cut with this country. Many of them couldn't pick up the pieces. Most of the people whom I know who are now in this position were decent and thoughtful, even deeply idealistic.

I imagine that, had Joseph not committed the act for which he was accused and to which he has pleaded guilty, he would now be in Iraq, perhaps helping us, those Americans who are there, to understand the intricate and brutal historic interaction among Sunnis, among Shiah, between Shiah and Sunni, among both and the Kurds and other ethnic and tribal groups, to say nothing of the remaining Christians in the country. Joseph also has a special feeling for Israel to which so many Jews of Iraq fled in the years 1948 to 1951. (Did you know that the Jews constituted a plurality of Baghdad up to that time?) Joseph is well respected in Israel for his own intimate knowledge of Arab politics and culture, and he is well respected in Washington for his intimate knowledge of Israeli politics and culture.

I know this has been a humiliating experience for Joseph, punitatively humiliating. He will not do anything off the straight and narrow again. The question is whether he will be permitted to take up his life's passion, the spreading of knowledge about the Middle East and the bringing of peace to its peoples.

Sincerely,

Martin Peretz

# Exhibit 26

LEVINE | GREENBERG LITERARY AGENCY, INC.

August 17, 2004

The Honorable Allyne H. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

307 Seventh Avenue
Suite 1906
New York NY 10001

T 212.337.0934
F 212.337.0948

levinegreenberg.com

**RE: United States v. Joseph Braude 03-CR-1009(ARR)**

Dear Judge Ross:

I have known and worked closely with Joseph Braude as his literary agent for the last three years, during which he developed and wrote *The New Iraq*, published by Basic Books. Joseph has been to my home several times, including when my wife and I hosted a party to celebrate the publication of his book.

While I understand that Joseph has pled guilty, I hope that in sentencing him you will consider that any criminal behavior is totally uncharacteristic of the Joseph Braude I know.

Joseph is a remarkably intelligent, capable, and kind person, whose language skills and knowledge of the Middle East are rare and urgently needed. Rather than have him spend any time in jail, I hope you will allow him to use his talents constructively.

If I can provide any additional information, please don't hesitate to contact me at (212) 337-0934 x210 or jlevine@levinegreenberg.com

Yours truly,

James A. Levine
Principal

NEW YORK | SAN FRANCISCO

# Exhibit 27

**R. James Woolsey**
8283 Greensboro Drive
McLean, VA 22102-3838

September 6, 2004

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

RE: UNITED STATES V. JOSEPH BRAUDE 03-CR-1009 (ARR)

Dear Judge Ross:

I write to urge clemency, particularly with regard to incarceration, for Joseph Braude.

By way of introducing myself, I am currently a partner with Booz Allen Hamilton, working on homeland security issues. Until two years ago I practiced law for a total of 22 years in Washington, D.C. with Shea & Gardner (principally as a commercial litigator). I have held Presidential appointments in two Democratic and two Republican administrations, most recently as Director of Central Intelligence, 1993-95.

I have known Joseph for about two years, having been introduced by a mutual friend. I have been extremely impressed by his intellect and his knowledge of the Middle East. I know that he has been helpful to the U.S. Government in the past in matters related to the Middle East and terrorism. His book, The New Iraq, is in my view an extraordinarily fine piece of work, setting out a number of very useful ideas with respect to how we can best help Iraq move toward a civil society and decent government. I know of no other work in its league with respect to combining policy insights of this sort with an appreciation of the history and culture of Iraq.

I believe that Joseph still has much to offer this country and many contributions still to make in our understanding the Middle East. I believe that he has been harder on himself regarding the events that have led to this sentencing than any prison term could lead him to be. I would urge that this fine young intellect and committed patriot be given some other duty than a prison term to pay his debt to society. I believe that in that way we will all be far more likely to be benefited by further insights and positive contributions from him.

Sincerely,

R. James Woolsey

# Exhibit 28

243 West 99th Street #7D
New York City, New York, 10025

September 7, 2004

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

RE: United States v. Joseph Braude 03-CR-1009 (ARR)

Dear Honorable Judge Ross,

I am a professional writer and I have known Joseph Braude for almost three years, first as a source, then as a colleague and a friend. I am writing to assist you in your upcoming decision to impose a just sentence upon Joseph for his admitted crimes.

Joseph and I spoke for the first time when the fires were still smoldering from the ruins of the World Trade Center. On September 13, an eager editor from *Talk* magazine called me and asked me to report a story that had languished for months all around New York. It concerned a collection of Americans and Brits providing cellphone service to the Taliban in violation of United Nations sanctions.

My assignment was indicative of a much larger trend. Overnight, a part of the world routinely ignored was now relevant; everyone wanted to know more. Like many Americans, I was particularly ignorant about the Arab Middle East, its languages, and its business practices. I needed some help understanding this suddenly crucial world. Several people recommended I speak to a smart, young business analyst in Boston named Joseph Braude.

Joseph and I worked closely on that story and over the course of a few weeks we became friends as well. It didn't take long to recognize that I had bumped into an extraordinary man, with a remarkable story, extremely relevant for our particular times. While the Arab Middle East and Judeo-Christian West drifted farther and farther apart, Joseph's biography bound the two closely together. His family hailed from the Middle East while Joseph was raised in New England. Joseph attended the best American schools where he spent much of his time learning and thinking about Middle Eastern history and politics. As a professional, he continued to bridge the gap between these two worlds. As a man, he did the same, playing accordion in a klezmer ensemble at Yale while strumming the oud in nightclubs all over the eastern Mediterranean. He read Dylan Thomas and Al-Mutanabbi. My gut sense is that Joseph was never driven by the accumulation of money or outward success, but by the motivation that guides all renaissance men, to make the world a more enlightened and lively place.

As the White House's war on terror shifted from Afghanistan to Iraq, Joseph became even more relevant. Here was a man whose great- great-grandfather was the chief rabbi of Baghdad, whose mother fled the city in 1950. While the neo-conservatives talked about fostering a democracy in post-Saddam Iraq, it was obvious that it would take people like Joseph to help do it. Joseph had a comfortable, well-paying job, but when the Iraq question loomed larger, Joseph appeared to ready to rise to the challenge.

When Joseph showed me early drafts of his book, *The New Iraq*, I was stunned. At a time when cultural ignorance and political naiveté ruled, Joseph produced a work, in a few short months on furtive breaks from his fulltime job, that shattered the stale debate. While television commentators droned on about the possibility of war with Iraq, Joseph took that war and the American victory as his premise. He moved quickly to the much more penetrating question: what happens after? We now know, sadly, that he was one of the few people doing this work. (Joseph accurately predicted a protracted guerilla insurgency that would be stoked by the American occupation.) His book featured a confident, compassionate voice, that moved easily between

engaging history and astute observations about modern politics to more speculative discussions of future development trends in a post-conflict Iraq.

Some people questioned the book's suspiciously good timing, appearing in stores the same week as the troops invaded. Perhaps Joseph knew something he didn't share with me, but I suspect that this was a coincidence born of luck and of Joseph's deep understanding of the situation from a variety of perspectives. Others criticized Joseph's book as the product of a crass opportunist, seeking to make a career out of American aggression. This shallow attack missed the point. Joseph was both a realist and an optimist. He knew the war was going to occur and the only question was whether the people of Iraq would be better off for the change. He knew that he had something to offer the debate, and so he did. The media instantly embraced his voice as a vital new contribution. He appeared on the Today show and the Early Show and became a regular on news outlets such as CNN, NPR, and Fox News Channel. Joseph's personal path and that of the political story of the decade were inextricably linked.

Needless to say, the offers poured in for Joseph, from all sorts of places. For a few heady weeks, Joseph was weighing all sorts of secure, well-paying jobs in Baghdad. Despite this, I drove up to Boston one weekend and proposed that we start a newspaper together in Baghdad. I told Joseph over a sushi dinner that I had little interest in living in Iraq or running a newspaper. Yet I felt a deep conviction as an American, whose country had just invaded other country, that I had a responsibility to help make the situation better in any way that I could. I felt that Iraq, the United States, and the entire world, would be well-served by having a man like Joseph running an honest newspaper inside Iraq. He could bring the full force of his experience and insights to serve readers worldwide.

If Joseph had been the cynical opportunist, he would have waved me off and moved on to focus on his secure offers. The newspaper was a dicey proposition, in terms of money, time, and influence. When Joseph wondered aloud whether he could run the newspaper and accept a few of those lucrative consulting gigs, I told him he could not.

Yet before I picked up the check that night, Joseph committed to advancing the project. In the subsequent weeks, he spent hours working on the business plan with me and making calls on behalf of the project with his most influential friends. When he traveled to Baghdad on that fateful visit, he held a number of meetings that we had arranged to explore the feasibility of establishing our newspaper. This was not a crass choice of how to spend his time. This was evidence that this suddenly powerful, well-positioned man was openly exploring how he could best contribute in a meaningful and effective way.

I believe that the most recent chapters of Joseph's story, from his arrest at Kennedy Airport to his guilty plea in your Honor's court earlier this year, contain lessons for all of us. It is a cautionary tale about the confidence and bravado with which many of us Americans walk around the world. But I sense that the Government is seeking to do more than punish this man for his hubris. Since issuing its post-arrest press release, the Government has suggested that Joseph's arrest was a U.S. victory against smugglers seeking to plunder Iraqi riches. That larger insinuation, in the face of Joseph's biography and his plans, seems patently false. It is abundantly clear from my personal experience that Joseph Braude was a man whose entire life trajectory positioned him to be a crucial asset for the Iraqi people, in their efforts to establish a sane post-Saddam nation.

By pleading guilty to the charges against him, Joseph already has accepted a stiff punishment for his hubris. While events in Iraq have dominated the headlines, Joseph has spent more than a year of his life living in his mother's house in Providence. He may never be able to return to Iraq, let alone participate meaningfully in the Iraqi reconstruction. Given those facts, given the totality of the circumstances of the case, given the political climate in which this case was prosecuted, I believe it is just and fair for your Honor to impose a sentence that does not include incarceration. Sending Joseph Braude to prison would send the wrong message. It would reinforce the intolerance and entrenched positions that pollute our politics. What is needed is a moderate sentence that reflects the complexities of the world and a man like Joseph Braude in it.

Our society needs Joseph back, too. Joseph's biography and his communication skills have been sorely missing over this past difficult year. I believe Joseph, in whatever position he took in Iraq, would have been extremely helpful in fostering tolerance and mutual appreciation between the West and the Arab World. That's our loss. Now, it is time to let this extraordinary individual reconstitute and serve our society in some other way. This story is finished but I am convinced another one is yet to come. Let Joseph Braude begin to write it.

Thank you sincerely for your consideration.

Sincerely,

Ted Rose

# Exhibit 29

Rebecca Burr
404 Sharon Road
Chapel Hill, NC 27517

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: UNITED STATES V. JOSEPH BRAUDE 03-CR-1009(ARR)

Sept. 29, 2004

Dear Judge Ross,

I am writing in behalf of Joseph Braude. When I heard of his plight, I asked if it would be appropriate to write to the judge. I have known him since the late 1970's, early '80's. His mother, Rita Braude taught at the Providence Hebrew Day School where my daughter, Andrea, was one of her students.

As a journalist and scriptwriter, I have been published/produced in Providence, Boston, Los Angeles, Princeton. My husband and I are presently educating our children at home in Chapel Hill, North Carolina.

I know Mr. Braude as a young man of great talent and compassion. He has written a scholarly book; The New Iraq, which is, at the same time accessible to children. We read it to our eight year old and 11 year old as one of the resources to educate us about the situation in Iraq and the Mideast.

I join with those who would request leniency in sentencing Mr. Braude. I join with those who believe his freedom is as valuable to society as it is to him and his family.

Respectfully,

Rebecca Burr

# Exhibit 30

**HESKEL M. HADDAD, MD**

**(212) 427-1246**
**1125 PARK AVENUE, NEW YORK, NY 10128**

September 28, 2004

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: United States v. Joseph Braude
03-CR-1005 (ARR)

Your Honor:

Mr. Joseph Braude asked me to write a letter on his behalf.

I first met Mr. Braude when the war in Iraq started. As the president of The American Committee for the Rescue and Resettlement of Iraqi Jews I was concerned about the Jews who were still living in Baghdad. I wanted to go to Iraq to investigate the situation there, but Mr. Braude was very generous with his time and advise. He told me that he will be willing to do the investigation for me in Iraq, which he did. He even offered to accompany me if I decided to go there. He was supposed to meet me on the night of his return. He called me late that evening, and apologized that he was detained at the airport. The next day he came to my house and spent over two hours showing me the pictures of the Jews in Iraq and the Torah scrolls. I felt he did a great deed on behalf of these Jews, who since left to Israel, so that now there are only 11 Jews in Iraq.

Mr. Braude was again ready to help when I was invited by the Iraqi authorities to inspect the eye departments in Iraq, with the blessing of the Pentagon and Ambassador Bremer. Mr. Braude was extremely helpful to make sure that I will be safe in Iraq.

With the upmost sadness I read in the papers about Mr. Braude's legal problems. I offered Mr. Braude to be a character witness for him. Mr. Braude is a very intelligent and highly intellectual person. He has made tremendous contribution to this country in our understanding of Iraq and our future programs in Iraq. I feel very compassionate toward Mr. Braude and I hate to see him incarcerated. He certainly should be penalized and bear the consequence for what he did. Being a first time offender I would beg you to make his penalties financial, not physical. Please forgive me for my presumption, but your compassion will be well placed dealing with Mr. Braude.

Respectfully yours,

[signature]

Heskel M. Haddad, MD
Clinical Prof. of Ophthalmology
New York Medical College

# Exhibit 31

154 Waterman Street
Providence, Rhode Island 02906
August 25, 2004

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

RE: United States v. Joseph Braude 03-CR-1009 (ARR)

Dear Judge Ross:

I began treating Joseph Braude on February 4, 2000. He was referred to me upon his return to the United States from Israel, where he had been hospitalized for a manic episode. He was treated enough in Israel to enable him to return home to Providence. However, he was still quite unstable and needed immediate treatment. (He was in graduate school at Princeton at the time.) Initially, I saw him three times per week for four months until he was stable. I then saw him once per week for two months and then approximately every six months to check that his medications were appropriate and that his mood and thinking were stable. I saw him most recently April 5, 2004, when he explained the circumstances that surrounded his illegally importing Iraqi artifacts into the United States. Upon looking back on his behavior and bad judgment, he was shocked at what he had done and mortified about what was happening.

Mr. Braude has a Bipolar I Disorder, otherwise known as Manic-Depressive Illness. As a result, he has had recurrent depressions and a manic episode, which led to his hospitalization in Israel. At that time, he exhibited the typical symptoms of this disorder. His mood was greatly elevated. He got by with little or no sleep. He was agitated and his energy level was exceedingly high. He began projects but couldn't finish them. He couldn't focus his attention or concentrate. His thoughts were a mile a minute. He was hypersexual. He was grandiose and lacking in judgment. His thinking was so disordered that it was psychotic. In other words, he was out of touch with external reality, paranoid and delusional.

Medications prescribed for Mr. Braude are as follows. When I first saw him, he was on Haldol 5 mg 1 ½ qd (total of 7.5 mg), Risperdal 3 mg bid (total of 6 mg), Serax (30 mg), and Klonopin 0.5 mg, i tid (total of 1.5 mg). The Haldol and Risperdal are both antipsychotic medications that were prescribed because of the psychotic state he was experiencing. The Klonopin is for anxiety and is a tranquilizer. The Serax is also a tranquilizer. I gradually shifted him to Lamictal at different dosages that varied according to both the effects and the side effects. Lamictal is a mood stabilizer that is

needed in the treatment of Manic-Depressive Illness. It is also an antidepressant. He should remain on the Lamictal to try to prevent future manic-depressive episodes.

I have significant concerns for Joseph's mental health if he is incarcerated. He has a major vulnerability to deteriorate under stress. Given his psychology, prison conditions would be an extraordinary stress for him. If he is incarcerated, it would be necessary for him to continue to have his medications and he should have access to a psychiatrist, who is able to help him adjust the medications appropriately. Please do keep in mind that he would be at risk for deterioration.

Sincerely Yours,

Paul H Shield, MD

Paul H. Shield, MD

# Exhibit 32

HARMER JOHNSON
146 EAST 84TH STREET
NEW YORK, NY 10028

TEL (212) 535-9364
FAX (212) 861-9893

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn
New York 11201

September 20, 2004

RE: UNITED STATES V. JOSEPH BRAUDE 03-CR-1009 (ARR)

Dear Judge Ross,

I am an appraiser of ancient art and artifacts and have known Mr. Joseph Braude since May 2004, when I was asked to examine and appraise the three Middle Eastern cylinder seals that are the subject of this case.

From 1961 until 1973 I was with the auction house Sotheby's in London and New York, as an officer, department head and auctioneer, specializing in ancient art and artifacts including those from the Middle East. Since 1973 I have been an independent appraiser, writer and lecturer, and a consultant to Sotheby's and Christies, New York. I also work closely with museums and collectors throughout the United States, Canada and Europe.

Having studied thousands of cylinder seals in public and private collections in the United States, Europe and Middle East, I can state with assurance that the three seals in this case are of exceedingly minor consequence. They are not rare, the carved images on these cylinders are commonly seen on seals of the third millennium BC, the aesthetic quality and condition of the subject seals is poor to mediocre, and they exhibit nothing of particular significance or note.

I am aware that Mr. Braude has pled guilty in the above referenced case, and I recognize the seriousness of his offence. That being said, I retain considerable respect for his deep involvement and concern for the societies and cultures of the Middle East. I know from his writings that he is a fine scholar of Near Eastern languages and that he has devoted much of his life to the history of the Islamic world.

Mr. Braude's recent actions are totally uncharacteristic of his years and work prior to this case.

It is my understanding that the Court is not required to impose a prison sentence, and I strongly urge that Mr. Braude not be incarcerated for this crime. His act, concerning three unimportant cylinder seals, was clearly an aberrant act within a meaningful and unblemished life, and significant professional career.

Yours sincerely,

Harmer Johnson

# Exhibit 33

70 Orchard Avenue
Providence, RI 02906-5402
Office: 401-331-6070
Fax: 401-521-6012
www.temple-beth-el.org

**Temple Beth-El**
Congregation Sons of Israel & David

Chartered in 1855 • Member of the Union of American Hebrew Congregations

September 2, 2004

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

RE: United States V. Joseph Braude <u>03-CR-1009 (ARR)</u>

Dear Judge Ross,

I am the Senior Rabbi of Temple Beth-El in Providence, Rhode Island. I assumed my position in 1970 when I came to be associated with Joseph Braude's grandfather whom I succeeded in 1974.

I have known Joseph since his early childhood. I witnessed him flourish intellectually and have been impressed with his industriousness, creativity and civility.

I sincerely feel there is every reason to believe that Joseph Braude will strive to reclaim his good name and fulfill his immense potential to make a difference for good in society.

I therefore hope that the sentence he receives will provide the circumstances for this to happen.

Sincerely yours,

Leslie Y. Gutterman, *Rabbi* • Sarah E. Mack, *Assistant Rabbi* • Judith A. Seplowin, *Cantor*
Ruby Shalansky, *Executive Director* • Anita Steiman, *School Administrator* • Reini Silverman, *Librarian* • Louis P. Larisa, *Chief Accounting Officer* • Kenneth C. Kirsch, *President*
*Emeriti*: Seymour Krieger, *Director of Education* • Samuel J. Stepak, *Executive Director*

3 September 2004

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**RE: UNITED STATES V. JOSEPH BRAUDE 03-CR-1009 (ARR)**

To the Honorable Judge Ross,

I ask for the court's mercy in the sentencing of Joseph Braude.

My name is Jonathan Tirone. I am a U.S citizen living in Vienna, Austria and employed as a journalist with Bloomberg News. I have known Joseph Braude since September 2000, when we both began working with Pyramid Research in Cambridge, MA. The course of our relationship developed beyond the office and we became friends. We often spent time together discussing our personal histories, debating world events and sharing lessons learned from our experiences abroad.

I was shocked and saddened to learn that Joseph Braude broke the law by smuggling looted antiquities from Iraq into America in 2003. Joseph had always impressed me with his knowledge of Arabic culture. He would often recite poems and sing songs that, in their translation, seemed to convey a respect for the society that he had studied for so many years. It is profoundly disappointing to me that he erred, despite this cultural understanding, and in doing so hurt the people he respected.

He is guilty but I plea for your mercy, Judge Ross.

The choices that Joseph Braude made in 2003 caused me to question the person whom I thought that I knew. The facts imperiled our friendship. In the last year, we have occasionally corresponded with each other, visited once and talked on the telephone 5-6 times. It is on the basis of these interactions that I write this letter. Joseph Braude's understanding of his errors has developed in step with his contrition. He is a sorry man.

But he is not a broken man. I ask for your mercy, Judge Ross, because as a citizen of the United States I do not think it is in society's best interest to break Joseph Braude, and I am fearful that a term in prison would do just that to him. Can he be reformed? Based on our conversations, and more importantly, his own admission to guilt, I think that he can be. To that end, he has submitted himself to your court's help

Joseph Braude has much to give. As a friend I know this. He has given me insight into different cultures with which we must learn to live. He has given me a sense of tolerance, rare in its productive capacity to foster, what I considered to be, valuable dialogue. He has given me the trust, even when he found himself in error, that we can become better for our mistakes.

I know that Joseph Braude needs to give even more. I know that my submission is, as they say in Austria, 'like a drop of water on hot stone.' There are certainly considerations for the greater good that I know little about. However, based on my own experiences, I hope that Joseph Braude will be taught how to give even more within the context of an open society that needs him.

I thank you for your attention, Judge Ross and am confident that your sense of duty and wisdom will met the appropriate punishment to Joseph Braude.

With Respect and Kind Regards,

Jonathan Tirone
Land.-Haupstrasse 100/6
A-1030 Vienna
Austria
Telephone: +431 713 7613
Mobile: +43 664 421 9652
SS#: 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

HARVARD LAW SCHOOL

CAMBRIDGE · MASSACHUSETTS · 02138

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

October 27, 2004

RE: United States v. Joseph Braude 03-CR-1009 (ARR)

Dear Judge Ross,

I write in support of Joseph Braude, whom you will shortly be sentencing, to ask that you be lenient in imposing sentence upon him.

I am a professor at Harvard Law School. I met Joseph some years ago through my daughter when both she and Joseph were undergraduates at Harvard College. He sat around my kitchen table with a group of fellow students, all amazingly sharp, funny, connected to the world of national and international politics, informed both by reading and experience, measured and interestingly opinionated. I was particularly impressed with Joseph. He exuded knowledge of the scene in the Middle East, and moderation in his understanding of both the Islamic and Israeli side of the issues driving the unending conflict. I thought I saw in him a person who could make a difference in bringing the two opposing worldviews together.

When Joseph was indicted, he came to me for informal advice. He had made a terrible error of judgment, a stupid mistake, a lapse that would cost him the career in government service to which he was greatly looking forward, and which seemed to be his destiny. How could he do such a thing? How could he jeopardize everything for which he and many others in support of him had been working just for the sake of a few ancient stones? He could not explain. This was a lapse, an aberration, a moment of thoughtlessness and temptation he will regret and think about for the rest of his life. He has deeply tarnished his young reputation and has almost certainly lost his chance for a career in government service, no matter what the outcome of the sentencing. He knows he has deeply jeopardized his own future by the behavior for which he now stands convicted.

I continued to talk with Joseph about his case as it progressed. I do not want to, and am not at liberty to talk about the substance of our conversations, except to say that at every point I was impressed with Joseph's regret, honesty and dedication to being an honorable person, notwithstanding this aberrational lapse. I am totally convinced that Joseph's behavior in this case was aberrational. In my experience with him I have found him to be careful and caring. I witnessed first hand the relationships between Joseph and other members of his family, all relationships characterized by mutual respect, openness and concern.

Joseph continues to want, somehow, to use his skills to promote a peaceful and constructive resolution of the tensions between the Muslim world and the United States. He writes and speaks knowledgeably and moderately about the present and future of the Middle East. His is a valuable voice in a rhetorical environment characterized by extremism.

Please consider probation as the appropriate punishment for what Joseph has done. He has been shaken to his core by the prosecution against him. He has been mortified. I fully believe that he would demonstrate during a period of probation that he has learned the lesson of being an entirely law-abiding citizen.

Sincerely yours,

Charles Nesson

Charles Nesson
Weld Professor of Law
Harvard Law School
Cambridge MA, 02138

Joey T. Shabot
1512 Pine St. #3-F
Philadelphia, PA 19102
215-732-2338

September 20, 2004

The Honorable Allyne R. Ross
U.S. District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

*Re: U.S. v. Joseph Braude, 03-CR-1009 (ARR)*

Dear Judge Ross:

I am writing on behalf of Joseph Braude, who has pled guilty in your court to criminal conduct concerning the transport of certain artifacts from Iraq. My purpose in writing is to ask you to be lenient when sentencing Joseph.

I am a second year law student at the University of Pennsylvania Law School. I have known Joe for over 7 years. We first met when I was an undergraduate at Harvard and Joe would come on occasional weekends to visit his brother, Yoni, with whom I was friendly. I am a Syrian Jew, and I studied Arabic in college. Given my Middle Eastern background and interests, Joe and I instantly hit it off and always had much to talk about. We often spoke at length about the Middle East, Sephardic Judaism, and American politics. I enjoyed these conversations not only because Joe was deeply informed and intelligent, but also because he had a quick wit and a wonderful, self-deprecating sense of humor.

My relationship with Joe strengthened several years ago, after he had moved to Cambridge, when I returned there to study at the Program on Negotiation at Harvard Law School. During that year, Joe and I continued to spend time socially, sharing an occasional evening coffee or Shabbat dinner on Friday nights. I also assisted Joe on a research matter relating to his book on Iraq, when he needed an Arabic speaker to conduct some telephone interviews with experts in the Middle East. During this period, as before, I found Joe to be an overwhelmingly sensitive, diligent, and committed friend and colleague. Joseph Braude is, simply, a good person. He has a warm heart and a generous soul.

I understand that Joe has committed a criminal act, but I also know that he regrets what he did and that it was absolutely out of character for him to have done it. I know Joe has suffered tremendously over these last months, and I believe that the regret and pain of having been involved in this matter has been, in itself, a great punishment. I hope that you will exercise your discretion to give Joe the benefit of your mercy. Prison is not a place Joe belongs—he belongs in the library and in other fora where world debate transpires and political opinion is formed. His knowledge of the Middle East and his commitment to the field should continue to be a resource to his country and to society at large. Please do not hesitate to call me at the above telephone number should you wish to speak with me personally.

Respectfully,

Joey T. Shabot

09/20/2004 15:49 2155732400 U OF PA LAW SCH CPP PAGE 01

**TEMPLE HABONIM**
**165 New Meadow Road**
**Barrington, Rhode Island 02806**
**Telephone (401) 245-6536**

**Rabbi James B. Rosenberg**

**August 24, 2004**

**RE: UNITED STATES V. JOSEPH BRAUDE 03-CR-1009 (ARR)**

**The Honorable Allyne R. Ross**
**United States District Judge**
**Eastern District of New York**
**225 Cadman Plaza East**
**Brooklyn, New York 11201**

**Dear Judge Ross,**

**I am writing on behalf of Joseph Braude, who has pled guilty to federal charges arising out of the illegal importation of Iraqi artifacts. I have known Joseph since he was a young boy. I have been the rabbi here in Barrington, Rhode Island since August, 1974, while Joseph has lived much of his life in Providence. Since Rhode Island has a Jewish population of only about 18000, many of those families who are involved in the life of our state's Jewish community have come to know each other. As it turns out, Joseph's mother has been a bar mitzvah/bat mitzvah tutor at Temple Habonim for the past several years.**

**I have had the privilege of being with Joseph in different contexts and have found him to be a young man of prodigious talent: he is intellectually gifted, fluent in several languages, as well as an accomplished musician. We have had many opportunities to engage in serious conversation over the years. In my estimation, Joseph is a highly moral and idealistic young man, always striving to do what is right. Unfortunately, at times he can be foolishly, even recklessly naïve; that is to say, Joseph tends to assume that fair-minded individuals can somehow intuit his good intentions even if his motives are not readily apparent. I am afraid that Joseph's failure to distinguish between intention and action is what has led to his current difficulty.**

**Your Honor, I understand that as a judge you are called upon to balance the often conflicting claims of justice and mercy. I understand that Joseph Braude has pled guilty in this case and that the claims of justice demand some form of punishment. Regrettably, in this case Joseph's good intentions have led him to run afoul of the law. On the other hand, I know that Joseph is a decent, sensitive, and intensely ethical young man. I do not believe that it would serve the cause of justice to send such a person to jail. I can only hope that as you weigh the appropriate sentence for Joseph Braude, you will consider him to be worthy of the claims of mercy.**

**Sincerely,**

James B. Rosenberg

**James B. Rosenberg, Rabbi**