**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

TJS:DSM
F. #2003R01479

*One Pierrepont Plaza*
*Brooklyn, New York 11201*

*Mailing Address:* *147 Pierrepont Street*
*Brooklyn, New York 11201*

November 17, 2004

**BY HAND DELIVERY**

The Honorable Allyne R. Ross
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Joseph Braude
Criminal Docket No. 03-1009 (S-1)(ARR)

Dear Judge Ross:

The United States respectfully submits this letter in response to the defendant's motion of November 10, 2004, requesting a downward departure based on U.S.S.G. § 5K2.20 (aberrant behavior). For the reasons set forth below, the Court should not exercise its discretion to downwardly depart.

Section 5K2.20 of the Sentencing Guidelines provides, in pertinent part, that "[a] sentence below the applicable guideline range may be warranted in an extraordinary case if the defendant's criminal conduct constituted aberrant behavior."

The Application Notes define "aberrant behavior" as "a single criminal occurrence or single criminal transaction that (A) was committed without significant planning; (B) was of limited duration; and (C) represents a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. § 5K2.20, comment. (n.1). In addition, the Application Notes state that "[i]n determining whether the court should depart on the basis of aberrant behavior, the court may consider the defendant's (A) mental and emotional conditions; (B) employment record; (C) record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense." U.S.S.G. § 5K2.20, comment. (n.2). In promulgating Section 5K2.20, the Sentencing Commission noted that, "[a]s a threshold matter, this amendment provides that

departure is available only in an extraordinary case." United States v. Gonzalez, 281 F.3d 38, 44 (2d Cir. 2002) (internal quotations omitted).

Though the defendant identifies, inter alia, his record of good works including a long term relationship with various law enforcement agencies and officials; education; and scholarship in Middle Eastern languages, cultures and political affairs, and argues that these factors support his plea for leniency, these circumstances show that the defendant had every reason to appreciate the seriousness of his criminal conduct. Far from being driven by financial or emotional hardships, as so many aberrant actors are, the defendant, who should have been writing Op-Ed columns condemning artifact smuggling instead of engaging in it, purposefully deceived law enforcement, justified in his belief that he, and not the law, knew what was best for the artifacts.

In many cases that come before the Court, a defendant undertakes aberrant criminal activity because of financial necessity, a concern for personal safety or the safety of a family member, an addiction, or because of a recent trauma. None of these circumstances are present in this case. The defendant has had the benefit of a distinguished education, earning an undergraduate degree at Yale University and a Masters Degree at Princeton University. He has traveled extensively throughout the Middle East and Europe. And, in addition to his work as a senior analyst for a telecommunications consulting firm, in the year immediately prior to committing his crimes, the defendant wrote and published a book about Iraq.

The defendant asks this Court to consider his prior work with federal agencies in determining the appropriate sentence. However, despite all of his purported governmental contacts, the defendant never contacted anyone regarding the stolen artifacts that he possessed. The defendant purchased the looted cylinder seals in Baghdad on June 4, 2003. He remained in Baghdad until June 9, 2003, and communicated with people via e-mail and telephone. He then traveled to Kuwait where he stayed overnight and continued on to London, where he stayed for one day before arriving in New York. At no time, while in Baghdad, Kuwait, or London, did the defendant alert anyone regarding his possession of the three cylinder seals or about the additional artifacts displayed to him by the black-market merchant Mohammed. The defendant's lack of action regarding not only the seals he possessed, but the artifacts that were still available for purchase, undercut his subsequent claim that his sole purpose in

obtaining and possessing the items was to safeguard them.[1] His conclusion that "he knew best" reveals that his flouting of the law was, at its core, arrogant and not aberrant.

In addition, the defendant's claims that turning the seals over to someone in Baghdad was "too dangerous" because the "city was in chaos," and his claim that he only had one contact in Baghdad are inconsistent with his own previous statements to Immigration and Customs Enforcement. See Defendant's Motion at 4. In all of his conversations with ICE agents as well as representatives from the U.S. Attorney's Office, the defendant never claimed that the reason for his failure to return the artifacts was due to safety concerns. Rather, he stated that he couldn't turn the items over to Harold Rhode, the one U.S. Government official he knew in Baghdad because Mr. Rhode had left Iraq, and that the defendant wanted to turn the items over to U.S. personnel at the Presidential Palace, but that the wait to get into the palace was too long. At trial, the testimony was clear that day-to-day life in Baghdad was very safe and there were no lines at the palace. Further, the defendant's own statements show that he was moving throughout Baghdad and meeting with people in an effort to secure future employment. In addition, the defendant told ICE agents that he had passed out his resume to several Pentagon officials during his trip to Baghdad in an effort to get a job with the Office of Reconstruction. This contradicts his later statement that Mr. Rhode was the only government official he knew in Baghdad.

Finally, the defendant has no claim that he did not know the criminality of his actions. He chose to try and smuggle the stolen artifacts into the U.S. and lied to ICE agents in an effort to conceal his crime. Only a few months before committing his crime, the defendant wrote a book wherein he discussed smuggling in general and specifically acknowledged that artifacts from the Iraq Museum were "prized cross-border contraband." *The New Iraq* (Basic Books 2003) at 54.[2]

---

[1] The defendant's inaction is especially striking in contrast to the great lengths he went to in attempting to enter Iraq, conducting research, attempting to secure future employment for himself.

[2] Yet, at trial, defense counsel cross-examined one government witness about the difficulty in recognizing the cylinder seals as contraband, implying that the defendant might not have appreciated the criminality of his actions.

For the reasons set forth above, this case is not an extraordinary case warranting a departure based on aberrant behavior. The defendant knew the law and deliberately broke it. Just as ignorance of the law is no excuse neither is self-righteous disobedience. Unlike the law-abiding citizen driven to smuggle drugs to pay for health care or to erase a suffocating debt, the defendant committed this crime because he felt his own judgement as to the nobility of his purpose made him exempt. His crime was not one of panic, passion or desperation. It was calculated, willful, and contemptuous. Accordingly, the Court should not exercise its discretion to downwardly depart.

Respectfully submitted,

ROSLYNN R. MAUSKOPF
United States Attorney

By: ______________________
Deborah Sue Mayer
Assistant U.S. Attorney
(718) 254-6241

cc: Benjamin Brafman, Esq.
Clerk of the Court (ARR)
U.S. Probation Officer Mark Gjelaj (by facsimile)